UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------X
GRISTEDE'S FOODS, Inc.,

                    Plaintiffs,                    **MEMORANDUM & ORDER**

     -against-                                     06-cv-1260 (KAM)

UNKECHAUGE NATION, a/k/a UNKECHAUGE
POOSPATUCK TRIBE; HARRY WALLACE;
and THE POOSPATUCK SMOKE SHOP AND
TRADING POST,
                    Defendants.

----------------------------------X

**MATSUMOTO**, United States District Judge:

          Pending before the court is the motion of defendants
Unkechauge Nation a/k/a Unkechauge Poospatuck Tribe, Harry
Wallace, and the Poospatuck Smoke Shop and Trading Post to
dismiss for lack of subject matter jurisdiction pursuant to Rule
12(b)(1) of the Federal Rules of Civil Procedure.  For the
reasons set forth below, the defendants' motion is granted with
respect to the Unkechauge Nation and Harry Wallace, to the
extent that Harry Wallace is sued in his official tribal
capacity.  The defendants' motion is denied with respect to
Harry Wallace in his individual capacity and with respect to the
Poospatuck Smoke Shop.

**BACKGROUND**

## I.    Procedural History

On March 20, 2006, plaintiff Gristede's Foods, Inc.
("Gristede's" or "plaintiff") commenced this action against the
Unkechauge Nation, a/k/a Unkechauge Poospatuck Tribe (the
"Unkechauge," "Poospatuck" or "tribe") and the Shinnecock Tribe,
a/k/a the Shinnecock Indian Nation (the "Shinnecock");
individual defendants Harry Wallace ("Wallace" or "Chief
Wallace"), Randall King, James W. Eleazer, Jr., and Lance A.
Gumbs; the Poospatuck Smoke Shop and Trading Post (the
"Poospatuck Smoke Shop" or "Smoke Shop") and Shinnecock, Ltd.
Plaintiff, a chain of supermarkets in the New York City area,
alleged violations of the Racketeer Influenced and Corrupt
Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68, and the Lanham
Act, 15 U.S.C. § 1125(a), and state law claims for unjust
enrichment, unfair competition, deceptive trade practices, and
false advertising arising from defendants' tax-free cigarette
sales and advertising.  The Unkechauge inhabits approximately 50
acres of land along the bank of the Poospatuck Creek on the
southern coast of what is now the Town of Brookhaven on Long
Island, New York.

In July 2006, the defendants who were parties to this
action at the time filed a motion to dismiss for lack of subject

matter jurisdiction pursuant to Rule 12(b)(1) of the Federal
Rules of Civil Procedure, asserting that they are immune from
suit by virtue of their sovereign status as Indian tribes or
entities thereof.  In an order dated December 22, 2006, the
court deferred ruling on the Rule 12(b)(1) motion pending
further briefing and an evidentiary hearing on the tribal status
of the Shinnecock and Unkechauge defendants.  (Dkt. No. 29 at 12
(holding that the criteria for tribal recognition pursuant to
federal common law as articulated by Montoya v. United States,
180 U.S. 261, 255 (1901) applies to the determination of the
Shinnecock and Unkechuage defendants' tribal status).)  After
filing a motion for reconsideration, the defendants were granted
leave to file new motions pursuant Rule 12(b)(6).  Defendants'
motions to dismiss pursuant to Rule 12(b)(1) and for
reconsideration were subsequently withdrawn without prejudice to
reinstatement of the Rule 12(b)(1) motion if their new Rule
12(b)(6) motions were denied.  (Dkt. No. 41.)

On November 5, 2007, the court denied in part the
defendants' motion to dismiss pursuant to Rule 12(b)(6) and
permitted the defendants to renew their motion to dismiss
pursuant to Rule 12(b)(1).  Judge Amon referred discovery and
the evidentiary hearing relating to the defendants' tribal
status to the undersigned, who was the assigned Magistrate Judge
at the time.  The court set dates for discovery on the issue of

tribal status and a hearing for the defendants' Rule 12(b)(1)
motions.  On November 28, 2007, Judge Amon issued a supplemental
order, detailing the court's reasoning for its November 5, 2007
partial grant and denial of defendants' motion to dismiss
pursuant to Rule 12(b)(6), and granting plaintiff leave to amend
its complaint.  On December 21, 2007, plaintiff filed an Amended
Complaint to include those claims sustained by the court – the
false advertising claim under the Lanham Act and the state
consumer fraud claims – and to properly name Lance A. Gumbs in
his individual capacity for his ownership and operation of the
Shinnecock Trading Post, previously identified as Shinnecock,
Ltd.  Defendants Shinnecock, Randall King, James W. Eleazer,
Jr., Lance A. Gumbs and Shinnecock Trading Post subsequently
decided not to pursue their Rule 12(b)(1) motion and
successfully requested that the court vacate the tribal status
discovery schedule as to them.  (Dkt. Order 1/4/08.)

        Discovery on the issue of tribal status proceeded
before the undersigned with regard to the remaining Unkechauge
defendants.  Following the undersigned's appointment as a United
States District Judge, the case was reassigned from Judge Amon
on August 15, 2008.  On August 18, 2008, plaintiff filed a
Second Amended Complaint naming additional defendants not
parties to the Rule 12(b)(1) motion.  The evidentiary hearing
regarding tribal status was held on September 3, 2008 through

September 8, 2008, before the undersigned.  At the close of the
hearing, the court ordered the parties to "confer regarding the
submission of a comprehensive collection of the exhibits
admitted into evidence and file those exhibits by ECF no later
than 9/15/08."  (Minute Entry 9/8/08; 9/8/08 Tr. at 289-290.) [1]
The parties complied with the court order and submitted a
complete copy of all admitted joint exhibits on September 15,
2008.  (Dkt. Nos. 168-372.)  The parties submitted pre- and
post- hearing briefs and the court heard closing arguments on
December 22, 2008.

## II.  The Tribal Status Hearing

        In deciding a Rule 12(b)(1) motion to dismiss, the
court may rely on and refer to evidence outside the pleadings.
J.S. v. Attica Cent. Schs., 386 F.3d 107, 110 (2d Cir. 2004).
Pursuant to Judge Amon's order of December 22, 2006, the court
held an evidentiary hearing on the issue of whether the
Unkechauge meets the common law definition of a "tribe," defined
by the United States Supreme Court in 1901 as "a body of Indians
of the same or a similar race, united in a community under one
leadership or government, and inhabiting a particular though

---

[1]     "9/3 Tr." refers to the transcript of the hearing on
September 3, 2008.  Because the pagination of the transcripts
starts each day with the number 1, the court will designate both
the date and page number in reference to the hearing transcript.

sometimes ill-defined territory" ("<u>Montoya</u> criteria"). <u>Montoya</u>
<u>v. United States</u>, 180 U.S. 261, 266 (1901).

At the hearing, the court first heard testimony from
defendants' expert witness, Dr. John Strong, and fact witness,
defendant Harry Wallace, Chief of the Unkechauge. The court
qualified Dr. Strong as an expert in the area of Native
Americans in Colonial America with an emphasis on the Indians of
the East Coast and Long Island. (9/3 Tr. at 17.) Dr. Strong
graduated from St. Lawrence University with a B.A. in History in
1957. He obtained a Master's Degree in 1959, and a Ph.D in
social science from Syracuse University in 1967. He received a
National Endowment for the Humanities award in the area of
archaeology in 1978 and a Fulbright award in 1998. Dr. Strong
is a professor emeritus at Long Island University, where he
taught from 1965 until 1998. Dr. Strong has written three books
about the Indians of Long Island and approximately 25-30 peer-
reviewed articles in journals, and has presented more than
thirty papers at professional conferences. This is the first
lawsuit in which Dr. Strong has testified as an expert. (9/3
Tr. at 6-14.) Dr. Strong's research is in ethnohistory, an
interdisciplinary field that emerged in the latter half of the
last century. Ethnohistory combines models of analysis and
strategies of research from anthropology, history and
archaeology, and is commonly used when studying cultures without

written records.  (9/3 Tr. at 14.)  Dr. Strong considers his
area of expertise to be 17th century colonial history with an
emphasis on contact between Native Americans and Europeans.
(9/3 Tr. at 16.)

The court then heard testimony from defendants' fact
witness, Chief Harry Wallace.  Chief Wallace is an Unkechauge
member and current Unkechauge Chief, and has lived on the
Unkechauge reservation at Poospatuck continuously since 1991.
(9/3 Tr. at 81, 129-130.)  Chief Wallace earned his Bachelor's
Degree from Dartmouth College in 1975, where he majored in
American history and studied Native American issues.  He earned
a J.D. cum laude from New York Law School, where he wrote his
thesis on Indian sovereignty and Eastern United States Indian
land claims.  (9/4 Tr. at 65-67.)

Additionally, the court heard testimony from
plaintiff's experts, Joyce Davis and James Lynch.  Ms. Davis was
qualified as an expert in the field of genealogy, which she
defined as the "study of families generationally."  (9/4 Tr. at
186, 239-240.)  Ms. Davis received her Associate's Degree in
Language Arts in 1971 from West Valley College in Campbell,
California and completed her Bachelor's Degree in Native
American Studies in 1995 at George Mason University in Fairfax,
Virginia.  Ms. Davis testified that she took some genealogy
"classes through extension" while she was in college and through

7

"historical agencies." (9/4 Tr. at 186-188.) From 1993 until
1996, Ms. Davis was an Assistant Genealogical Researcher at the
Bureau of Indian Affairs ("BIA") at the Department of Interior.
(9/4 Tr. at 189.) Upon leaving the BIA, Ms. Davis has done
independent genealogy consulting projects for tribes, among
other jobs unrelated to genealogy. She has a genealogy
consulting business in Net Lake, Minnesota. (9/4 Tr. at 185.)

Mr. Lynch was qualified as an expert in the field of
ethnohistory. (9/8 Tr. at 55.) Mr. Lynch has a Bachelor's
Degree in anthropology, sociology and religious studies, and a
Master's Degree in anthropology and ethnohistory from Wesleyan
University. Mr. Lynch completed all of the requirements for a
Ph.D, except for his dissertation. (9/8 Tr. at 3-4.)[2] His
studies focused primarily on ethnohistory and American Indians
of the northeast, southwest, and subartic Inuit groups. (9/8
Tr. at 5-6.) Mr. Lynch has published several articles for
presentations, one of which was in a peer reviewed journal. He
also published two books, one about Connecticut land

---

[2]    The court questioned Mr. Lynch about the use of the "Ph.D"
designation on Mr. Lynch's curriculum vitae ("c.v."), given that
he does not, in fact, have a Ph.D. Specifically, Mr. Lynch's
c.v. states "**Ph.D**, Anthropology/History (abd.)(Ethnohistory,
Sociocultural Change)." (Ex. 301 at 98.) Mr. Lynch explained
that the "(abd.)" designation on his c.v. indicates "all but
dissertation," which Mr. Lynch stated clarifies his status.
(9/8 Tr. at 7-10; Ex. 301 at 98.) The court respectfully
disagrees. Without Mr. Lynch's oral explanation, Mr. Lynch's
c.v. in combination with his chosen format appears to represent
that he earned his Ph.D degree, even though he did not.

transactions with Indian tribes and one about an Indian community in Connecticut. (9/8 Tr. at 11-13.) Mr. Lynch has been self-employed since 1999, and owns his own company, Historical Consulting Research, LLC. (9/8 Tr. at 14.) When asked to describe his research methodology for reviewing historical documents, Mr. Lynch responded, "I believe if there's no evidence to prove a point, the point is not proven." (9/8 Tr. at 47.) Mr. Lynch's research methodology has never been tested by a peer-review process in academia, but he testified that his work "is under strict review by the federal government." (9/8 Tr. at 51-52.)

Mr. Lynch testified that his consulting for retained clients does not involve academic scholarship. He has previously testified as an expert witness in ten other matters involving federal recognition of Indian tribes by the United States Department of the Interior, Bureau of Indian Affairs ("BIA"), pursuant to 25 C.F.R. § 83.7. Mr. Lynch found adversely to the tribe's federal recognition in nine matters in which he was retained by clients opposing tribal recognition. (9/8 Tr. at 37-41.) In the one matter in which Mr. Lynch found in favor of federal tribal recognition, he was retained by a client that supported tribal recognition. (9/8 Tr. at 40-41.)

On the basis of the testimony of these witnesses, the expert reports and other joint exhibits admitted into evidence herein, the court summarizes the evidence before it as follows.

## A. Body of Indians of the Same or Similar Race

The court heard evidence from all four witnesses about the first Montoya criterion for tribal determination: "of the same or similar race."  The parties' experts dispute the definition of "race" as used by Justice Brown in Montoya's "same or similar race" criterion.  Defendants' expert, Dr. Strong, testified that Justice Brown used the "conventional understanding of race of 1900: Caucasoid, Mongoloid, Negroid, Australoid, etc." (9/3 Tr. at 20.)  According to Dr. Strong, Justice Brown was "referring to a body of Indians of diverse ancestry . . . [of the] same or similar race." (9/3 Tr. at 20.) The experts relied on genealogy, historical documentation of race relations and interactions between Indians and the first Europeans, and the geographic location of the Unkechauge.  Dr. Strong concluded that the Unkechauge is a group of people of the same or similar race. (9/3 Tr. at 21-22.)  Mr. Lynch applied a sociological approach to race, under which individuals of the same or similar race are those "who claim descent from an individual or from a kinship group" (9/8 Tr. at 64), and

concluded that those claiming to be Unkechauge were not of the same or similar race.  (9/8 Tr. at 70.)

The Unkechauge was a non-literate culture at the first contact with Europeans, and, thus, did not have archives or records that one would find in a literate culture.  (9/3 Tr. at 15.)  Additionally, many tribal documents were destroyed by a fire in the Unkechauge church established in 1750, on what is known as the Unkechauge reservation at Poospatuck.  (9/4 Tr. at 87-89; Ex. 213.)  Therefore, in light of the unavailability of written records, Dr. Strong based his opinion that the Unkechauge is a group of Indians of the "same or similar race" in part on evidence identifying the Unkechauge as a distinct Indian group throughout the centuries and genealogical evidence of the Unkechauge at Poospatuck.

Dr. Strong cited archaeological data from the southern coastline area of what is now Brookhaven, Long Island, records after 1640 from colonial New York and the Town of Brookhaven, court records during the 19th and 20th centuries, family records of the two prominent families that dominated the southern half of Brookhaven, the William Smith family and the William Floyd family, accounts by visitors to the Poospatuck throughout history and newspaper clippings (Exs. 1, 3-364), in which specific Unkechauge individuals, leaders and families appear. For example, the evidence includes a document from the Town of

Brookhaven dated 1655, in which an Unkechauge headman named Mahew first appears with Sachem (Chief) Warawakmy and other village headmen, allied through political and kinship connections, to convey land that includes the northern half of present-day Brookhaven. (Ex. 1 at 21; Exs. 7, 8.)[3] Dr. Strong also identified Unkechauge individuals and groups in documents from the 1660s and 1690s involving Unkechauge Sachem Tobacus who negotiated whaling, fishing and land agreements and sought protection from the colonial government (Ex. 1 at 27-36; Ex. 9B; Ex. 10-11; Ex. 15; Ex. 19; Ex. 22), and documents dated July 1700 in which colonist William Tangier Smith conveyed 175 acres of land, previously conveyed to Smith by the Unkechauge Sachem Tobacus, to eleven representatives of the Unkechauge Indians and their children in posterity (the "1700 conveyance"). (9/3 Tr. at 42-46; Ex. 61, 62.) Included in the 1700 conveyance is the 50 acre plot along Poospatuck creek "where the Unkechaug[e] settlement had been in prehistoric times." (Ex. 1 at 46.)

Dr. Strong also noted the efforts in the 1740s of Scottish Missionary Azariah Horton to proselytize the Unkechauge

---

[3]     The names of Sachem Warawakmy and Mahew are not legible on Exhibit 7 due to either redaction or highlighting, but the same page with their legible names appears in Ex. 8.
        Dr. Strong testified that the Europeans gave the Indians names appearing on the documents based on orthographic spellings. As a result, a particular individual's name might be spelled differently on different documents reflecting transactions with another European. (9/4 Tr. at 38-39.)

(Ex. 1 at 49-55), and then Secretary of State Thomas Jefferson's 1791 visit to the Unkechauge at Poospatuck and his compilation of an Unkechauge vocabulary from two elderly Unkechauge women and another young Unkechauge woman who assisted with translation. (Ex. 1 at 63-66.) Contrary to Jefferson's description of the women as the last "three of this tribe now who speak it's [sic] language" (Ex. 72 at 470), Dr. Strong noted that the Unkechauge language was still being spoken in 1875 when Henry Clinton visited Poospatuck and recorded two men who provided him with Unkechauge words. (Ex. 1 at 65.) Mr. Lynch also acknowledged Clinton's 1875 visit to Poospatuck in his expert report. (Ex. 301 at 52.)

Other examples that the Unkechauge has been recognized as a distinct group include the state's establishment of an Indian school at Poospatuck in 1875 (Ex 1. at 79-81) that resulted from an 1874 petition on which the names listed can be connected back and forward to Unkechauge members (9/3 Tr. at 75), the Poospatuck's appearance on a Department of the Interior list of "Indian Population of the United States" in 1915 (Ex. 130 at 66), Unkechauge children's admission to local public schools as New York State Indians in 1954 (Ex. 170), the publication of reports about Poospatuck affairs in the 1960s through the present (see, e.g., 177, 183, 194, 223), and an

exhaustive hearing in New York Surrogate's Court to determine
the blood rights of certain Unkechauge in 1982 (Ex. 2).

Dr. Strong testified that the present-day Unkechauge
is the ancestor of the racially distinct group identified in the
above-mentioned documents based on the Unkechauge's migration
and language patterns as well as genealogy.  The Unkechauge was
part of a large North American coastal group of Indians that
spoke Algonquin root languages.  Thus, the Unkechuage,
Shinnecock and other tribes spoke separate Algonquin root
languages, analogous to separate French, Portuguese, and Spanish
languages sharing a common Latin root.  (9/3 Tr. at 15.)  Dr.
Strong examined the settlement patterns of Algonquin speaking
peoples on Long Island, a common research model used by
ethnohistorians to predict where a group has a settlement.  The
Algonquin peoples usually settled along creek beds, fresh water
streams and salt water because of the inter-stasis of two
ecozones and access to shellfish, fish, fowl, marine mammals and
woodland plants and game.  (9/3 Tr. at 15-16.)  According to Dr.
Strong, the Poospatuck settlement "fit the [settlement pattern]
perfectly."  (9/3 Tr. at 16, Ex. 1 at 2-3.)  The fact that the
Unkechauge never migrated out of its present location led Dr.
Strong "to conclude that [the present day Unkechauge is] the
same group of people."  (9/3 Tr. at 24.)  Dr. Strong's report
states that "[t]he fifty acre plot along the bank of Poospatuck

creek was undoubtedly where the Unkechaug[e] settlement had been in prehistoric times.  The location fits with the archaeological models for coastal Algonquin villages," and is the current location of the Unkechauge reservation.  (Ex. 1 at 46; Ex. 46.) Dr. Strong notes that historian Osborn Shaw has also concluded that the Indians at Poospatuck in 1949 were "all descended from the [Unkechauge] named in the 1700 [conveyance]."  (Ex. 1 at 50, 129 (citing Shaw, Osborn 1949 "The Town of Brookhaven," 249-302, Lewis Historical Publishing Co.))

Additionally, Dr. Strong testified that, based on a learned treatise, <u>The New Deal in American Indian Tribalism</u>, by Graham Taylor (Ex. 357), intermixing among North American Indian tribes was "widespread" by the 1930s, noting, for example, that in two Chippewa tribes, 87%-97% of the members were of mixed blood.  Indeed, the exhibit indicates that on every major reservation listed there are Indians of mixed blood.  (9/3 Tr. at 27; Ex. 357 at 153.)  Dr. Strong testified that, even on first contact between the Indians and Europeans, "it was not uncommon . . . for Indian women to be impregnated by white men." (9/3 Tr. at 23.)  According to Dr. Strong, the children of Indian women and European men "would of course not be accepted in white society, but they would live with their mother [in an Indian village]."  (9/3 Tr. at 23; Ex. 1 at 67.)

Dr. Strong found the Unkechauge's intermixing consistent with patterns of race relations between Europeans and Indians on the East Coast. Based upon his review of historical records, Dr. Strong acknowledged intermixing between the Unkechauge and people of other races from the beginning of the Unkechauge's contact with other groups, including the English in 1640 and African-Americans. (9/3 Tr. at 23-28.) As a result, children of Unkechauge mothers and European fathers were incorporated into the Unkechauge community since early contact with the Europeans. (9/3 Tr. at 23.) Similarly, the Unkechauge absorbed freed African-American slaves and children born from intermixing of Unkechauge and African-Americans. (9/3 Tr. at 26, 191.) Dr. Strong testified that the historical interaction between the Unkechauge and Europeans and African Americans resulted in a slowly changing biological make-up of the Unkechauge, as children of mixed parentage were absorbed into the tribe, but that did not destroy the Unkechauge people or culture. (9/3 Tr. at 25-28.)

To the contrary, Mr. Lynch disputed that the documents cited by Dr. Strong established that the Unkechauge was a people of "the same or similar race." Rather, according to Mr. Lynch, the documents show racial intermixing among the Unkechauge and the resulting decline of the Unkechauge population and race. (See, e.g., 9/8 Tr. at 10, 71, 162, 166.) Mr. Lynch concluded

that the Unkechauge has been so altered as a result of its
contact with other groups that it has ceased being a group "of
the same or similar race." (9/8 Tr. at 120-121, 166.) Relying
on the sociological approach to race, under which individuals of
the same or similar race are those "who claim descent from an
individual or from a kinship group" (9/8 Tr. at 64), Mr. Lynch
concluded that the Unkechauge is not of the "same or similar
race" because it is comprised of "five different racial groups
as defined by Montoya. . . . Poospatuck, . . . Shinnecock, . . .
Montauk, . . . Anglo-American, and . . . African American."
(9/8 Tr. at 70-71.) To satisfy Montoya, Mr. Lynch testified
that the Unkechauge would have to establish that, at least
through 1800, its members descended from one of the eleven
Unkechauge individuals in the 1700 conveyance. (9/8 Tr. at 266-
267.) A portion of land from the 1700 conveyance was
subsequently conveyed by Sarah Solomon in 1791 to William Floyd;
Mr. Lynch found no evidence that Solomon was associated with the
Unkechauge. (9/8 Tr. at 267.) This led to Mr. Lynch's
conclusion that Solomon was the last person at Poospatuck and,
even assuming that Solomon had genealogical ties to the eleven
individuals named in the 1700 conveyance's deed, the lineage to
the eleven individuals ended with her. (9/8 Tr. at 271-272.)
Additionally, Mr. Lynch's report stated that by 1800, the
Unkechauge community at Poospatuck was tri-racial and a decrease

in the population had occurred.  (Ex. 301 at 44-46.)  Mr. Lynch
relied on an account from 1883 that stated, in part, "[t]here
was never any tribe of Poospatuck Indians.  A few families of
the old Unkechauge Indians were given [illegible] fifty acres at
Poospatuck.  They are much mixed with the Negroes and probably
not more than three could be presented who have the Indian
features."  (9/8 Tr. at 129.)  He concluded that the individuals
currently residing at Poospatuck are not of the same or similar
race.  (9/8 Tr. at 70, 129, 166.)

        Contradicting Mr. Lynch's testimony that there was
scant evidence of Unkechauge descendants at Poospatuck after
1800, Dr. Strong highlighted a school petition by the Unkechauge
from 1874 (Ex. 88; 9/3 Tr. at 75-79, 118-119), a court decision,
Dana v. Maynes, (Suffolk County, New York, Mar. 10, 1936), in
1936 (Ex. 149; 9/3 Tr. at 87-98 ), and another court decision,
In Re Treadwell, 820 N.Y.S.2d 846 (N.Y. Sup. Ct. 1983), in 1983
(Ex. 202; 9/3 Tr. at 130-134), in which some of the Unkechauge
families at Poospatuck, including the Cuffees, Davises,
Langhornes, Treadwells and Mayneses were identified.  (9/3 Tr.
at 130-134; Ex. 1 at 110 ; Ex. 202.)  Dr. Strong discussed the
Dana v. Maynes decision from 1936 in which Dana filed a notice
to evict two families from the Poospatuck lands, claiming that
he held title to the land and that the Unkechauge families
claiming to have title through inheritance were not Unkechauge.

(9/3 Tr. at 87-88; Ex. 149.)  However, in the 1936 <u>Dana</u> case,

Judge Richard Hawkins concluded that the defendants had shown

that they were ancestors of those named in the 1700 conveyance's

deed.  (9/3 Tr. at 96-97.)  The <u>Dana</u> court determined that even

though the defendants were not full-blooded Unkechauge

ancestors, they were entitled to the land.  (9/3 Tr. at 97.)

        The evidence upon which Dr. Strong relied, linking the

modern day Unkechauge to the Unkechauge of colonial times, was

supplemented by testimony of Chief Wallace about his own

genealogical connection to the Unkechauge of colonial times.

Chief Wallace traced his genealogy to the early 1700s, back to

the Davis and Cuffee lineage.  (9/4 Tr. at 151-154.)  Chief

Wallace testified that his great-grandparents, William Davis and

Virginia Hunter, were listed as "Indian" in census data and

birth and death records.  (9/4 Tr.at 151.)  William Davis'

grandfather, Joel Davis, was listed as "Mulatto"[4] on the 1865 New

York census (Ex. 110 at 2) which, according to plaintiff's

expert genealogist, validates the heritage of Chief Wallace and

"many" others as Poospatuck.  (9/3 Tr. at 189-91; 9/5 Tr. at 73-

76; Ex. 311 at 19.)  Joel Davis' lineage is descended from his

father, Steven Cuffee (9/4 Tr. at 152.), and grandfather, Peter

Cuffee, who married the daughter of Reverend Peter John, a

---

[4]     "Mulatto" is a term once used to describe individuals of
black and white, or black and Indian parentage.  (9/3 Tr. at
189-191.)

19

minister who married an Unkechauge woman and moved to the Poospatuck reservation where he founded a church in 1750 and lived until his death at the age of 88. (9/4 Tr. at 152; Ex. 1 at 58-59.) Joel Davis was actually a Cuffee, whose name was changed because he lived with and worked for the Davis family as an indentured servant. [5] (9/3 Tr. at 118-119, 133.) In plaintiff's expert report, Mr. Lynch agrees that Reverend Peter John founded a church on the Poospatuck reservation; however, he states that Reverend Peter John was a Shinnecock and that Peter Cuffee was his grandson. Therefore, according to Mr. Lynch, Peter Cuffee was Shinnecock, not Unkechauge. (Ex. 301 at 42-44.) As explained by Dr. Strong's report, however, Peter John married an Unkechauge woman, with whom he had seven children, and their grandson was Reverend Paul Cuffee, thus establishing Unkechauge lineage through the Cuffees. (Ex. 1 at 59.)

Chief Wallace testified that the Unkechauge has a "one drop" blood quantum requirement for tribal membership, which means that any degree of Unkechauge blood would establish tribal membership. (9/4 Tr. at 172; Ex. 1 at 78.) As Dr. Strong states in his expert report, the "one drop" rule was also used by Americans in the southern slave states to determine the racial status of African Americans and later Indians, and those

_____

[5]    Dr. Strong testified that it was common for servants, many of whom were Indians, to take the name of the family for whom they worked. (9/3 Tr. at 196-197; Ex. 1 at 76-78.)

born of mixed parentage.  (Ex. 1 at 78.)  Chief Wallace
explained the procedure for establishing blood right membership
in the Unkechauge tribe, which was codified in the tribal
customs, rules and regulations, but was in practice prior to the
adoption of that document.  (9/4 Tr. 89-90, Ex. 307.)  The
procedure for establishing blood right membership includes
submitting an application, personal information and documentary
proof.  The application and supporting information are reviewed
by the Unkechauge tribal council.  (9/4 Tr. at 90-91; Ex. 307.)

      Pursuant to the Unkechauge Constitution, Article 1,
those residing on the Poospatuck reservation must have a
hereditary blood right of the Unkechauge.  (9/4 Tr. at 91.)  The
exception to this rule is non-blood right spouses of blood right
members, who "enjoy all privileges of his or her blood rights
spouse which are customary in maintaining a normal marital
life. . . ."  (9/4 Tr. at 91; Ex. 171 at 8.)  Non-blood right
spouses do not have a vote at tribal meetings and are not
eligible for elected office.  (9/4 Tr. at 91.)  Currently, there
are 200 members of the Unkechauge tribe residing at Poospatuck
who are eligible to vote.  (9/4 Tr. at 181.)  There are
additional members who do not reside at Poospatuck and are
therefore not eligible to vote.  (9/4 Tr. at 184.)  Wallace
explained that, based on his personal involvement in the case,
the thirty-four blood right members deemed eligible to vote at

the time of the 1983 New York State Surrogate's Court's decision in Treadwell were selected as representatives of the families residing on the Unkechauge reservation. Subsequent to the Treadwell court's decision, a person seeking tribal membership has to establish a connection to one of those thirty-four representatives. (9/4 Tr. at 181-183.)

Relying on census data, plaintiff's expert, Ms. Davis opined that the group of "people who claimed to be Poospatuck are probably not Poospatuck" and thus are not a body of Indians of the same or similar race. (9/5 Tr. at 4-5.) Ms. Davis testified on cross-examination that the value of census forms "for reaching a genealogical conclusion is to give [] an indication of who was there [at Poospatuck] and not . . . for an accurate indication of race." (9/5 Tr. at 70.) Ms. Davis further testified that the first census in the United States was conducted in 1790 (9/5 Tr. at 23), but a category for counting Indians was not provided until 1870, and census enumerators were not explicitly instructed to count Indians until 1880. (9/5 Tr. at 27.) Dr. Strong agreed with Ms. Davis, that it is difficult to extract an accurate indication of race from census reports "because, first of all, of the enumerators themselves and their cultural biases, and secondly, because the lifestyle of the working class peoples . . . who they're trying to count." (9/3 Tr. at 232.) It was common for at least one individual from a

family to stay on the reservation while the other family members worked for families off of the reservation. (9/3 Tr. at 232-233.) Mr. Lynch, while acknowledging the racial biases of census enumerators in the 19th and 20th centuries, stated that racial bias would be a low factor to account for when reviewing census data from that period. (9/8 Tr. at 170.)

Ms. Davis made conclusions in her expert report based on census data. According to Ms. Davis, "the families of Joel Davis and Sabra (Waters) Davis and that of Richard Ward and his wife, Francis . . . appear to be the only families who may trace, and the only ones who have ancestry" to those named in the 1700 conveyance. (Ex. 311 at 10.) Ms. Davis further stated in her report that "If **Joel Davis**, from whom nearly all of today's Poospatuck descend, would have been listed as Mulatto, validity of many of the Poospatuck, including the present Chief," as Unkechauge descendents would be more certain. (Ex. 311 at 19.) However, as evidenced by the 1865 New York State census and acknowledged by Ms. Davis, Joel Davis was listed as "Mulatto." (Ex. 110 at 2; 9/5 Tr. at 73-75.)

Ms. Davis also concluded, based on the 1900 census, that the Unkechauge Edwards line died out with a certain Martha Edwards because she had no children (Ex. 311, at 28-29), and, therefore, the present-day Edwards families cannot be traced to the Poospatuck ancestry. (Ex. 311 at 28-29.) However, the 1880

census indicates that a "Martha Edwards" had four sons (Ex. 311, Tab 20), and Ms. Davis admitted that it would be reasonable to infer that the 1880 and 1900 censuses are referring to the same "Martha Edwards."  (9/5 Tr. at 80.)

## B. United in a Community Under One Leadership

The court also heard and admitted evidence regarding the second Montoya criterion, "united in a community under one leadership or government."  Defendants' expert, Dr. Strong, referred to "anthropological models for community.  Community for these people would be intersecting, extended family systems, living in geographic proximity to each other on the same land and sharing other values - attitudes towards the land, religious attitudes, language, [and] other characteristics."  (9/3 Tr. at 30.)  With regard to the second component of this criterion, Dr. Strong understood "under one leadership or government" to mean "the functioning of a political structure in that community." (9/3 Tr. at 30.)  Dr. Strong concluded that this Montoya criterion was satisfied.

Plaintiff's expert, Mr. Lynch understood Justice Brown's reference to a "community" in Montoya to mean a "tribal community" — "a group of people living within a concentrated area that provides their own means of self-identity."  (9/8 Tr. at 68-69.)  According to Mr. Lynch, the second component of this Montoya criterion, "leadership," is whether "the body politic

24

was following the leadership in a unified way, making a concert of action." (9/8 Tr. at 69.) Mr. Lynch concluded that this Montoya criterion was not satisfied because, although the Unkechauge is a community – "a group of individuals living within a concentrated area, from which they draw their primary social identity" – it is not a tribal community. (9/8 Tr. at 86, 198-199, Ex. 301 at 12.) Mr. Lynch stated that "because there was no evidence [of a tribal community between 1800 through 1874] you can't say that it exists." (9/8 Tr. at 80.) According to Mr. Lynch, evidence of leadership or government would include petitions, correspondence with government officials, and records of meetings between local leadership and tribal leadership. (9/8 Tr. at 124.)

Dr. Strong relied on a variety of evidence dating from the later 1600s through the 1980s in reaching his conclusion that the second Montoya criterion of a united community under one leadership or government was satisfied. In 1665, in a meeting with Governor Richard Nicolls, the Unkechauge and Shinnecock met to establish the eastern boundary of Unkechauge land, which was entered into colonial records. Plaintiff's expert, Mr. Lynch, notes that this was "the first tacit recognition of the Unkechauge as a tribal entity by the [colonial] government of New York." (Ex. 301 at 17.) According to Dr. Strong, during a court hearing in 1667, an Unkechauge

Sachem was consulted about hunting grounds on land in present-day Flanders, and Unkechauge Sachems "were often called upon to settle boundary disputes between English towns" in the New York colony. (Ex. 1 at 22-23.) As acknowledged by Mr. Lynch, in 1676, a group of Unkechuage petitioned Governor Andros regarding whaling and fishing rights. (9/8 Tr. at 224; Ex. 27; Ex. 301 at 18.) Additionally, in 1677, the Unkechauge, in concert with several other Long Island tribes, protested the exploitation of the Indians by the Europeans to Governor Andros, who implemented a policy of endorsing land sales. (Ex. 1 at 33.) Dr. Strong further testified that a series of land transactions in the 1700s between the Unkechauge and the colonists are evidence of a community with leadership. According to Dr. Strong, these transactions were entered into by certain Unkechauge individuals in their representative tribal capacities. (9/3 Tr. at 42-43, 58.)

Mr. Lynch's testimony traced the disintegration of the Unkechauge community back to land conveyances to the Europeans before 1700 and thereafter. (9/8 Tr. at 78; Ex. 301 at 30.) According to Mr. Lynch, the 1700 conveyance was a leasehold, not a fee simple conveyance. (9/8 Tr. at 96; Ex. 301 at 33.) In 1730, Nicoll Floyd acquired the leasehold rights to 100 of the 175 acres contained in the 1700 conveyance. (Ex. 301 at 34.) Mr. Lynch testified that, based on a 1755 conveyance of a

portion of land contained in the 1700 conveyance, the Unkechauge community had dissolved because the 1755 conveyance was not by any of the eleven Unkechauge individuals named in the 1700 conveyance.  (9/8 Tr. at 236.)  Mr. Lynch concluded, therefore, that the Unkechauge was an Indian community at its inception, but "by 1800 . . . there [were] only a few speakers of the native tongue . . . no cultural practices . . . . [and] individuals were conveying land rather than it being collectively done away with."  (9/8 Tr. at 77.)

Dr. Strong, however, highlighted other evidence from the late 1700s through the 1800s that the Unkechauge was perceived and functioned independently as a united community with leadership.  In the 1794 Treaty of Canandaigua a/k/a the Pickering Treaty and the Treaty of Six Nations, the Six Nations Iroquois entered into a treaty with the United States that incorporated the "friends of the Six Nations."  In 1995, Judge Emery Williams, Chief Justice of the Court of Appeals of the Seneca Nation, in response to a request by the Internal Revenue Service for an interpretation of the Treaty of the Six Nations and the Jay Treaty, stated that the treaties were intended to encompass the Unkechauge and all New York Indians as parties by referring to the "friends" of the Six Nations Iroquois Confederacy.  Chief Justice Williams explained that many New York Indian tribes, including Long Island tribes, had sided with

the British against the colonists during the Revolutionary War,
noting that the Long Island tribes had signed a peace treaty
with the British in 1664.  The Treaty of Six Nations and Jay
Treaty included all New York Indians and attempted to end
hostilities and preserve territorial sovereignty of the Indian
Nations.  The Six Nations had always maintained political and
economic relations with the Unkechauge.  The Six Nations Seneca
and Oneida traded wampum with the Unkechauge and provided
sanctuary and protection to the Long Island tribes against
colonial aggression during the Revolutionary War.  Chief Justice
Williams further noted that one of the principal functions of
his court was to interpret through historical records and
precedent the treaties entered into between the Indian Nations
and the United States, and noted that the decisions of his court
were given full faith and credit by federal and state courts.
(9/3 Tr. at 60-62; Ex. 255.)  Mr. Lynch testified that Chief
Justice Williams wrongly interpreted the 1794 Treaty.  (9/8 Tr.
at 224-227; Ex. 255.)

Dr. Strong acknowledged that there were fewer primary
sources documenting the Unkechauge tribe and leadership dating
from the 1800s than from the 1700s.  Dr. Strong explained that
this was because land transactions formed the primary basis of
documentary evidence and were fewer in the 1800s.  (9/4 Tr. at
12.)  Dr. Strong noted that this lack of records is consistent

with North American Indian tribes generally.  (9/4 Tr. at 14.)
As evidence that the Unkechauge tribe was intact during the
1800s, and recognized as a united community by the Town of
Brookhaven, Dr. Strong noted the efforts in 1818 of Elizabeth
Woodhull, the daughter of General Nathaniel Woodhull, to
acknowledge William Cooper, a Poospatuck Chief, who died in the
War of 1812 aboard the U.S.S. Constitution (also known as "Old
Ironsides"), and the corroboration of William Cooper's death by
a Navy ship surgeon.  (9/3 Tr. at 66-67, 73-75; Ex. 75.)  In
1845 and 1871, journalists reported on the June Meeting at
Poospatuck, an annual community religious and cultural event,
which was earlier documented in 1669 records of the Rhode Island
colonial assembly noting that a Niantic Sachem testified that
his tribe had hosted Long Island Indians at the summer festival.
(Ex. 1 at 11, 72.)  Other seasonal Indian celebrations had been
observed by Europeans as early as 1624 by Dutch scholar
Nicholaes Van Wassenaer.  (Ex. 1 at 10.)  These Indian
ceremonies were forced underground or celebrated as family
gatherings because of prohibitions by the dominant colonial
government that feared that plots against them could be planned
during large Indian gatherings.  (Ex. 1 at 11.)

        In 1855, Unkechauge Chief William Cooper's widow,
Dorthea Smith, filed for a share of the bounty that had been
awarded to the crew of U.S.S. Constitution for sinking a British

warship in a battle off the coast of Nova Scotia. (9/3 Tr. at 68; Ex. 75.) Dorthea Smith later married Obediah Cuffee, a deacon in the Poospatuck church in 1834. (Ex. 1 at 70.) Reverend Nathaniel Hawkins, of the Town of Brookhaven, testified at a hearing that established that Dorthea Smith was William Cooper's widow. (9/3 Tr. at 73.) Furthermore, in 1874, under the leadership of Chief Jacob Ward, the Poospatuck community petitioned the state for a school. (9/3 Tr. at 75; Ex. 301 at 50.)

    Mr. Lynch discounted evidence of united community action in 1874, the Unkechauge petition to the state secretary of education, and again in 1881, an election of Unkechauge trustees, because they are "two isolated incidents within almost a hundred-year period." (9/8 Tr. at 80.) Mr. Lynch testified that, by 1800, it appeared that there were no social, cultural, or political links to the original eleven Unkechauge families named in the 1700 conveyance. (9/8 Tr. at 82-83.) Instead, individuals from other tribes and neighboring bands were infiltrating the land. Ethnic and social barriers distinguishing the Unkechauge from other bands were breaking down. (9/8 Tr. at 83, 107, 235-236.) According to Mr. Lynch, this suggests that the norms and values of the society were in flux. (9/8 Tr. at 108.) Additionally, the Unkechauge language was extinguished and social roles were changing as women were

signatories to land contracts, in contravention of the male-
dominated culture.  (9/8 Tr. at 83, 105, 117-120, 138.)  Mr.
Lynch, however, acknowledged that women were generally
responsible for care of the land.  (9/8 Tr. at 149.)  Mr. Lynch
testified that land around the fifty acre Poospatuck reservation
began to be conveyed by individual Indians, as opposed to
collectively, apparently without community consensus or
political authority.  (9/8 Tr. at 109.)  Furthermore, an
individual of Montauk ancestry conveyed "the last of the
leasehold rights" to the Floyd family, indicating a lack of
Unkechauge self-identity and leadership.  (9/8 Tr. at 110.)
Moreover, according to Mr. Lynch, the religion of the Unkechauge
people also transitioned from traditional beliefs to
Christianity.  (9/8 Tr. at 110-111.)

Mr. Lynch stated that "from 1830 onwards there is no
evidence of a functioned political authority within the
community."  Ex. 301 at 44.)  To further support his conclusions
that the Unkechauge lacked both a united community and
leadership, Mr. Lynch relied on Sarah Floyd Turner's 1850
account, replete with terms and overtones that would be
considered racist by contemporary standards, of the "brawls and
squabbles" and the dissolution of the Unkechauge community.  Mr.
Lynch testified that Sarah Turner's writing reflected acceptable
biases of that time and that he accounted for the biases in

reaching his conclusions.  (9/8 Tr. at 126-128, 151-152; Ex. 84.)

As evidence supporting unified tribal action in the 1900s, Dr. Strong pointed to a 1935 New York Times article which reported that there was an attempt by the Department of Education to close the Unkechauge Indian school that was the subject of the Chief Jacob Ward's 1874 petition.  (9/3 Tr. at 76-77; Ex. 145.)  The minutes of the town meetings at Brookhaven in 1934 and 1935 indicate that members of the Unkechauge tribe, as well as individuals from outside the Unkechauge community, came forward to advocate a reversal of the State's decision to close the Unkechauge school.  (9/3 Tr. at 78-82; Ex. 148.) Ultimately, the Unkechauge school was kept open.  (9/3 Tr. at 84; Ex. 146.)  Mr. Lynch's report quotes the 1935 Directory and Yearbook of the Public Schools, Second Supervisory District of Suffolk County's notation that "Poospatuck is a community of itself.  A church, a school, a cemetery, thirteen little but comfortable homes which shelter approximately twenty-five children and twenty-five adults. . . . the church is a small building over 200 years old . . ."  (Ex. 301 at 62.)  Dr. Strong also pointed to the Tribal Rules, Customs, and Regulations, commonly referred to as the Unkechauge Constitution, as evidence of community and government leadership.  (9/3 Tr. at 103-104; Ex. 171.)  Dr. Strong testified that the Unkechauge Constitution

was documented as of the 1950s. In contrast, Mr. Lynch found no evidence of membership criteria or tribal rules until 1964. (9/8 Tr. at 147.)

As evidence that the Unkechauge was perceived as a unified community with leadership within and outside of the tribe, Dr. Strong noted that the State Attorney General represented the Unkechauge defendants in the _Dana_ case in 1936. (9/3 Tr. at 85.) The Attorney General stated that the reservations in the Eastern states are inhabited by the original occupants, citing the 1888 Whipple Report[6] as support for the community at Poospatuck. (9/3 Tr. at 87.) Furthermore, Judge Richard Hawkins recognized, in _Dana_, that the culture of the Unkechauge had remained intact. (9/3 Tr. at 93-94.) Mr. Lynch agreed that Judge Hawkins found that the Unkechauge had a blood right to their land based on the 1700 conveyance, but Mr. Lynch believes that Judge Hawkins was incorrect. (9/8 Tr. at 172-73.) Additionally, Mr. Lynch acknowledged that the 1888 Whipple Report recognized the Unkechauge as an Indian community that occupied fifty acres on the south shore of Long Island, annually elected three trustees to manage their affairs, and had a church, a Sabbath school and a State school. (9/8 Tr. at 171-72.)

---

[6] The "Whipple Report" is entitled "Report of Special Committee Appointed by the Assembly of 1888 to Investigate the 'Indian Problem' of the State." (Ex. 101.)

Dr. Strong relied on several documents from the latter half of the twentieth century demonstrating New York State recognition of the Unkechauge tribe as a basis for his opinion that the Unkechauge is a "community" under one "leadership." These included laws enacted in 1972 and 1974 by the State of New York granting the Unkechauge and other Indian tribes licenses without charge to hunt and fish off the reservation, and to regulate hunting and fishing without state licenses on the reservation. (9/3 Tr. at 107-108; Ex. 196.) Additionally, in 1974 the New York State Senate and Assembly submitted a joint resolution requesting that the United States Congress "enact legislation granting legal recognition by the United States government to Poospatuck and Shinnecock Indian Tribes. . . ." The resolution noted that the Poospatuck and Shinnecock Tribes executed peace treaties with the King of England prior to the formation of a colonial government. (9/3 Tr. at 109; Ex. 191.) This request was never acted upon. (9/3 Tr. at 109-110.) As further evidence, Dr. Strong cited the letter from the Chairman of the Subcommittee on Indian Affairs in New York to the Commissioner of the Department of Social Services in Albany requesting funds for a boundary survey for the Poospatuck reservation. (9/3 Tr. at 111; Ex. 193.) In 1978, the State incorporated the Unkechauge Constitution into the laws of the State. (9/3 Tr. at 119-120; 9/4 Tr. at 92-93; Ex. 198.) In a

January 1982 letter to the Florida Governor's Council on Indian
Affairs from then New York Governor Carey's Associate Attorney,
the State of New York noted that, although no specific
guidelines existed in New York for acknowledging whether a
Native American group is an Indian tribe for state governmental
purposes, all presently acknowledged Indian tribes had been so
acknowledged since colonial times or shortly after the American
Revolution.  The letter further stated that the Poospatuck was
treated as an Indian tribe by the colonial government and its
continuing status has been referred to in several acts of the
New York State legislature.  The letter additionally noted that
other tribal organizations were mentioned in documents from
colonial times and in early state legislative acts, but ceased
to exist and were no longer acknowledged as Indian tribes for
state governmental purposes. (9/3 Tr. at 120-121; Ex. 200.)

        Dr. Strong further testified that, as of 1966, Chief
Edward Treadwell's tribal leadership is demonstrated by the
Chief's discussion of his attempts to address the economic
problems on the reservation, such as poverty and homes in need
of repairs.  In a February 1966 news article, Chief Treadwell
stated that "the ideas of past [Unkechauge] leaders at
Poospatuck to remain a self-sufficient community" resulted in a
deterioration in the community of the 155 residents of
Poospatuck.  Chief Treadwell also described his efforts to learn

about federal anti-poverty programs and discuss issues with county and school officials.  (9/3 Tr. at 149; Ex. 178)  Dr. Strong also pointed to records of cultural activities on the reservation in 1971 (9/3 Tr. at 149 Ex. 184) and the organization of the annual corn festival in 1973 (9/3 Tr. at 149; Ex. 188).  Additionally, there was evidence that Chief Treadwell continued his attempt to improve housing on the reservation in 1979.  (9/3 Tr. at 148; Ex. 199.)

Dr. Strong noted Judge Signorelli's statement regarding the Unkechauge in Treadwell that "[i]n light of the fact that this tribe for some time has been without a governing body and there does not exist a tribal council qualified to call or supervise the next tribal election, this court does hereby schedule a hearing."  Dr. Strong testified that Judge Signorelli's statement is not an indication of a lack of tribal leadership, but rather an indication that the governmental structures established by the Unkechauge were at an impasse. (9/3 Tr. at 135-136.)  Although Unkechauge elections were held annually, following the death of Chief Treadwell in 1981 (9/3 Tr. at 148; Ex. 184.), the tribe did not hold an election for a three year period between 1981 and 1983, sparking the Treadwell litigation.  (9/4 Tr. at 72-73.)  Mr. Lynch discounted Judge Signorelli's 1983 findings in Treadwell, which identified a line of Unkechauge leaders going back to the 19th century, because

the Judge did not go back far enough in time.  (9/8 Tr. at 180-182.)  Furthermore, Mr. Lynch could not conclude that named leaders were <u>functioning</u> leaders.  (9/8 Tr. at 219-220.)  Mr. Lynch characterized the leadership of former Chief Junius Langhorne during the late 1980s as "dysfunctional" because "the community was objecting to his apparent negligence by allowing non-members to come in and take up residence on the reservation."  (9/8 Tr. at 146.)

According to Dr. Strong, the fact that the tribe went outside of its own dispute resolution procedures in <u>Treadwell</u> was not indicative of the lack of leadership among the Unkechauge.  (9/3 Tr. at 140-141.)  New York State Indian law provides for the resolution of disputes between Indians in state courts.  (Ex. 299K.)  Furthermore, Dr. Strong opined that the decision to seek an outside tribunal's help was itself a result of tribal leadership.  (9/3 Tr. at 143-44.)  Chief Wallace explained that the tribe sought outside resources for resolution of the dispute because the tribe had no tribal court; therefore, there was no peaceful way to resolve the issue.  (9/4 Tr. at 73.)  Despite the hiatus from tribal elections, Chief Wallace testified that the Unkechauge had a functioning government in 1982 and 1983, during the time that <u>Treadwell</u> was being litigated.  (9/4 Tr. at 72.)

Dr. Strong also highlighted evidence that the
Unkechauge was a community with leadership following the
Treadwell decision.  The State's position, that the Unkechauge's
tribal status is derived from the treatment as a tribe by
colonists and the State of New York, is reiterated in a letter
in 1985 from the Secretary of State to the New York State
Assembly (9/3 Tr. at 122-23; Ex. 209), and in a 1988 cover
letter stating that the Unkechauge is recognized by New York
State through treaties negotiated with the colonists.  (9/3 Tr.
at 122-23; Ex. 223.)

An August 1994 letter from the New York Assistant
Director of the Office of Industry and Community Relations
stated that the 1700 conveyance expressed the colonial intent to
grant the "tribe the right to possess land and to render the
land inalienable."  The 1994 letter notes that the State of New
York honored deeds and patents of its colonial predecessor, and
that the State "has provided for the education of children on
the Poospatuck reservation since 1846."  (9/3 Tr. at 127.)

Another letter dated from October 4, 1994, from the
New York State Department of Economic Development to Chief
Wallace, states that "New York State has a government to
government relationship with the Poospatuck or Unkechauge Indian
Nation . . . ."  (Ex. 238.)  Mr. Lynch acknowledged this
correspondence and agreed that the document established a

functioning government on October 4, 1994. (9/8 Tr. at 194; Ex. 238.) In addition, a 1996 letter from the New York Attorney General to an Administrative Law Judge stated that the Unkechauge and Shinnecock "whose relationship and treaties with New York State Government predate the existence of the Federal Government, are the only New York tribes recognized by the State, but not by the federal government" (9/3 Tr. at 123-124; Ex. 262).

As further evidence of a tribal community under leadership, Dr. Strong pointed to an invitation to the Chief of the Poospatuck from the Town of Brookhaven for the Unkechauge to apply for community development funds (9/3 Tr. at 142; Ex. 206), a letter to Chief Wallace from the Director of Economic Opportunity for the State of New York regarding development aid for the Unkechauge reservation (9/3 Tr. at 142-43; Ex. 210), and a letter to Chief Wallace from the director of Special Services of the school district regarding a grant for the Indian children in the district (9/3 Tr. at 147; Ex. 254). Dr. Strong notes that the New York State constitution refers to the acts of the legislature and common law of the colony of New York and states that they shall continue to be the law of the State, including the relationships with the Unkechauge tribe established during the Colonial period. (9/3 Tr. at 128-129; Ex. 299.)

Further evidence of the tribe's sovereignty and government, according to Dr. Strong, includes the New York State Department of Transportation's request to Chief Wallace for permission to do road work on the reservation. (9/3 Tr. at 147; Ex. 245.) Dr. Strong also pointed to several state court decisions in which cases against the Unkechauge were dismissed because of the tribe's sovereign immunity. (9/3 Tr. at 153-154; Ex. 287, 291.)

Dr. Strong also highlighted correspondence between Unkechauge chiefs and the federal government: Chief Junius Langhorne and the U.S. Department of Housing and Urban Development corresponded regarding funding to improve the sewage disposal system at the reservation in 1987 (9/3 Tr. at 144; Ex. 214, 216), and in 1994, Chief Harry Wallace was invited by United States Representative Charlie Rose to attend a meeting at the White House of non-federally recognized tribes. (9/3 Tr. at 146; Ex. 239.) Additional evidence of the Unkechauge corresponding with the federal government, relied upon by Dr. Strong, includes the notification by the United States Geological Survey to the Unkechauge Indian Nation about a proposal by the Aquidneck Indian counsel to change a geographic location to an Indian name, pursuant to federal policy. (9/3 Tr. at 151; Ex. 283.)

In contrast to the testimony of Dr. Strong and Chief Wallace, Mr. Lynch testified that the State of New York only explicitly acknowledged the Unkechauge community twice: once in 1667 when Governor General Nichols mediated a land dispute between the Unkechauge and Shinnecock (9/8 Tr. at 84), and in 1943, when the New York legislative committee held hearings at Poospatuck. (9/8 Tr. at 84.) When confronted with other above-mentioned exhibits, Mr. Lynch was steadfast in his position that the Unkechauge was not recognized as a tribe by the colonial government in New York province or thereafter by New York State, proffering the explanation that there is no evidence to support the contrary view by New York officials that there was such recognition. (9/8 Tr. at 186.) However, Mr. Lynch also conceded that New York State statutes recognize the Unkechauge. (9/8 Tr. at 189; Ex. 191.)

Chief Wallace supplemented Dr. Strong's testimony with testimony regarding the more recent evidence of the Unkechauge's community and leadership. Chief Wallace testified regarding the Unkechauge's tribal council, consisting of elected officials and a Chief. Chief Wallace has served as Chief for the past 15 years. (9/4 Tr. at 81.) As Chief, Wallace chairs council meetings, represents the tribe at public events, and controls the voting process. (9/4 Tr. at 81-82.) Additionally, Chief Wallace instituted a method for record-keeping, organized the

administration of the tribal community center, and has
implemented procedures to maintain the land.  (9/4 Tr. at 82.)
It is common for Chief Wallace to receive correspondence
regarding proposed actions by the state or federal government
that could affect the tribe.  (9/4 Tr. at 145-146.)  One example
is a December 1999 letter to Chief Wallace from the Department
of Health & Human Services referencing a conversation that Chief
Wallace had with an Equal Opportunity Specialist in the Office
of Civil Rights about racial disparities in healthcare.  (Ex.
274.)

There are three tribal land trustees who are elected
every three years, but elections are staggered so a trustee is
up for election every year.  (9/4 Tr. 82, 98-104.)  There are
three other positions elected annually for secretary, treasurer,
and keeper of records.  (9/4 Tr. at 82.)  In evidence is a
document from 2000 that is entitled "Notice to the Unkechauge
Community" that includes information about voter registration
and the general tribal election.  (Ex. 276.)  The land trustee's
primary responsibility is maintenance and control of the tribal
land, resolution of disputes over occupancy and designation of
land for certain uses.  (9/4 Tr. at 83.)  The tribal council has
an agreement with the Department of Transportation to maintain
roads.  (9/4 Tr. at 118.)  The treasurer maintains the tribal
reservation funds.  (9/4 Tr. at 83.)  The secretary records

minutes and keeps records.  (9/4 Tr. at 83.)  The keeper of
records maintains birth, death and marriage records.  (9/4 Tr.
83.)  Records are kept at the community house.  (9/4 Tr. at 86.)
The tribal council meets at least once a month, and special
council meetings are periodically called.  (9/4 Tr. at 86.)  The
tribal council's meetings are held in the community center,
which was built in the late 1980s.  (9/4 Tr. at 87-88.)  Prior
to the construction of the community center, meetings were held
at the church established in 1750 on the reservation, which was
destroyed by a fire in 1987. (9/4 Tr. at 87-88.)  At the time of
the church's destruction it was nearly 250 years old.  (9/4 Tr.
at 89.)  Chief Wallace added that, based on his own research,
the governmental structure he described was in place prior to
1957, when the Unkechauge constitution was adopted.  (9/4 Tr. at
96.)

        The tribal council is assisted by several "issue-
oriented" tribal organizations, such as the community committee
and the parent committee.  These committees assist the tribal
council in formulating grants for their particular issues.  (9/4
Tr. at 126.)  The parent committee, for instance, is focused on
the improvement of the cultural component of the educational
grant.  (9/4 Tr. at 126-127.)  Additionally, the tribe has a
June Meeting committee to organize the annual tradition known as
June Meeting.  (9/4 Tr. at 127.)  June Meeting is a tribal

community event during which services are held at the church, ceremonies consisting of song and dance take place, and elders and those who passed away are honored. (9/4 Tr. at 128.)

Chief Wallace additionally testified regarding the tribe's effort to encourage traditional cultural practices of the Unkechauge. This includes teaching the Unkechauge native language on the reservation (9/4 Tr. at 104-105), and the practice of making wampum of the purple colored shell, unique to the Unkechauge coastal area on Long Island, to record major and sacred events throughout Unkechauge history. Chief Wallace testified that, like the language, the making of wampum was underground for generations due to repression and abuse. Wampum was traded by the Unkechauge with the Iroquois, Montauk, Seneca and Dutch. (9/4 Tr. at 106, 110-111.) Additionally, Chief Wallace presented in evidence a "warrior's belt" which is handmade from wampum during times of struggle and an Unkechauge Nation belt, representing unity. (9/4 Tr. at 107-109; Exs. 375, 376.)

Further, Chief Wallace stated that many tribal members are members of the church on Unkechauge land, but many members believe in the "traditional spiritual way." (9/4 Tr. at 147.) Some members, including Chief Wallace, attend church and practice some of the traditional religious ceremonies. (9/4 Tr. at 147-148.)

Chief Wallace also testified regarding the tribe's
bank accounts for health services, community development,
emergency services and special requests.  (9/4 Tr. at 84, 148.)
There are two components of the Unkechauge health program,
pursuant to a contract with the State of New York.  (9/4 Tr. at
148.)  One component is a provision for free prescription
medication and the other is for consultative services.  (9/4 Tr.
at 148.)  There is also a tribal senior services program that
provides meals and cultural activities.  (9/4 Tr. at 149.)  The
tribe also has a summer youth program and cultural programs for
youths.  (9/4 Tr. at 150.)

Additionally, the tribe maintains a building fund and
a scholarship fund for higher education (9/4 Tr. at 84), and a
community center with an after school program, free computer
access for students, and administrative offices.  (9/4 Tr. at
85-86, 118.)  The major source of tribal funds is from business
licenses by the tribe to businesses owned by individuals, as
well as grants from the federal and state governments.  (9/4 Tr.
at 85, 131-142; Exs. 272, 210, 226, 238, 252.)  All businesses
on the reservation are licensed by the tribal council.  (9/4 Tr.
at 116.)  One of the businesses on the reservation is Chief
Wallace's smoke shop which he opened in early 1991 or late 1992.
(9/4 Tr. at 157.)  In one dispute between two businesses, the
tribal council asked for the assistance of the Justice

Department, which has a department of dispute resolution for Indians, in a proceeding that was in state court. (9/4 Tr. at 117.)

Mr. Lynch testified that in 1994, after the election of Chief Wallace, the Unkechauge was "still politically and socially dysfunctional." (9/8 Tr. at 85.) In support of this conclusion, Mr. Lynch cited to a lack of a working sewage system, a half-built community center, and a church in disrepair. (9/8 Tr. at 85.) Additionally, the Unkechauge government was "ignoring its own constitution and bringing individuals who had no right to be on the reservation there." (9/8 Tr. at 85.)

### C. Territory

Finally, evidence was heard and admitted regarding the third Montoya criterion, "inhabiting a particular, though ill-defined territory." Dr. Strong understood this criterion to be a measure of an "ill-defined area" of land without regard to ownership and distinguished it from a tribal territory, which refers to hunting territory governed by kinship systems. (9/3 Tr. at 32-33.) He concluded that the Unkechauge satisfied the third Montoya criterion because it has historically inhabited and currently inhabits a particular territory, the fifty acre parcel at Poospatuck.

Plaintiff's expert, Mr. Lynch, distinguished an "ill-defined territory" from a federally recognized reservation and defined territory as a "very large region." (9/8 Tr. at 70.) Mr. Lynch testified that Montoya implies that "possession" of the territory is required, but acknowledged that there are no specific words in the Montoya decision that require Indian ownership of the inhabited territory. (9/8 Tr. at 241-244.) Mr. Lynch concluded that the third Montoya criterion was not satisfied by the Unkechauge because the fifty acre parcel inhabited by the Unkechauge was not owned by the Unkechauge in the 17th and 18th centuries and is not large enough to be considered a territory. (9/8 Tr. at 248-250.)

Dr. Strong testified that the Unkechauge currently inhabit 50 acres of land along the bank of the Poospatuck Creek on the southern coast of Long Island and there is evidence of their presence dating back four or five thousand years. (9/3 Tr. at 34-38; Ex. 298; see also 9/4 Tr. at 111.) He based his conclusion on archaeological excavations, anthropological evidence, maps depicting the Unkechauge in the area, and colonial deeds and newspapers, among other things. The location of the Unkechauge is how the tribe got its name: "Unkechauge" means "the place view of the hill," and "Poospatuck," used interchangeably with "Unkechauge" to describe the tribe, means "the creek that flows into saltwater." (9/3 Tr. at 34-35.) Dr.

Strong identified the Unkechauge on maps depicting Long Island in 1620 and the 1840s, and on a map of the Town of Brookhaven from the 1970s. (9/3 Tr. at 36-37; Exs. 6, 298.) Based on the foregoing maps, Dr. Strong concluded that the Unkechauge had a continuing presence at and near the Poospatuck Creek in Long Island. (9/3 Tr. at 38.)

According to Mr. Lynch, between roughly 1600 to early 1700, the Unkechauge described their land base as extending from the present day border of Islip, New York to Southampton and between the Long Island Sound and the Atlantic Ocean ("Mastic Neck"). (9/8 Tr. at 98-99.) Mr. Lynch's testimony and documents in evidence revealed that the Unkechauge territory decreased significantly throughout the centuries.

Mr. Lynch testified that in 1692, Indian title to the lands of Mastic Neck were conveyed by the Unkechauge to English colonist William Smith (9/8 Tr. at 91), of which 175 acres were reconveyed by Smith to the Unkechauge in 1700 as the 1700 conveyance. (9/3 Tr. at 45.) Dr. Strong concluded that the 1700 conveyance was in fee simple because of the deed's language and reference to two ears of corn, a formality that an ear of corn was given to the individual conveying land. (9/3 Tr. at 44-45.) Additionally, the transaction was treated as a fee simple conveyance by the Town of Brookhaven and by Smith's son, who sold off parts of what had been the Smith manor to the Floyd

family soon after the 1700 conveyance, after Smith died. (9/3 Tr. at 45-46.)

Mr. Lynch testified the 1700 conveyance was part of a manorial grant from the King in October 1693 and was not in fee simple but was a leasehold to eleven Unkechauge individuals who had inheritable rights to the land vested in their families and their direct descendents. (9/8 Tr. at 82-83, 252.) According to Mr. Lynch, the leasehold right encompassed solely the right to reside, and William Smith reserved for himself the right to useable botanics within the area. (9/8 Tr. at 95.) In 1730, the Unkechauge conveyed a leasehold right to Richard Floyd, entitling the Unkechauge to rights only to Poospatuck Neck and Constable's Neck. (9/8 Tr. at 101.) Mr. Lynch testified that this 1730 leasehold conveyance led to the formation of the Poospatuck community, which included Poospatuck Neck, and fifteen acres on Constable's Neck, as well as several other parcels. (9/8 Tr. at 95.) According to Mr. Lynch, the Unkechauge subsequently surrendered the leasehold right to Constable's Neck in 1789. (9/8 Tr. at 105-106.)

The designation of the type of conveyance as either a fee simple or leasehold in the 1700 conveyance was tested in the 1936 Dana case, in which the plaintiff, seeking to evict two Unkechauge families from the Poospatuck territory, argued that the 1700 conveyance only conveyed the right to plant. Judge

Hawkins interpreted the 1700 deed as one in fee simple that included the right of the Unkechauge to inhabit the land, and found in favor of the defendants. (9/3 Tr. at 96; Ex. 149.) As a result of this dispute, in 1938, Eugenie Smith, a descendent of William Smith, formally conveyed 50 acres of the 1700 conveyance in fee simple to the Unkechauge. (9/3 Tr. at 51-52, 106-107; Ex. 155.) In Dr. Strong's opinion, the Eugenie Smith deed was not necessary because the land was already owned by the Unkechauge. (9/3 Tr. at 52.) According to Mr. Lynch, it was not until 1938 when Eugenie Smith conveyed to the Unkechauge the fee simple title to the Poospatuck land that the Unkechauge had ownership over the land.

Mr. Lynch testified that Judge Hawkins' conclusion that the Unkechauge had a blood right to the land based on the 1700 conveyance is incorrect. (9/8 Tr. at 172-177.) Nevertheless, the 1700 conveyance's designation as leasehold was "the foundation upon which [Mr. Lynch] built [his] conclusions" (9/8 Tr. at 173-174), in part because of his understanding that Montoya requires "jurisdiction" over the land and Smith retained jurisdiction through the leasehold. (9/8 Tr. at 249.)

To support his conclusion that the 1700 conveyance was in fee simple, Dr. Strong also relied on a documents dated after Judge Hawkins' 1936 Dana decision. For example, in April 1994, the assistant town attorney of Brookhaven wrote to the Assistant

50

Director of the Office of Industry and Community Relations in Albany, New York, asking for documentation regarding New York's recognition of Unkechauge land as a New York Indian reservation. (9/3 Tr. at 125; Ex. 233.) In response, the New York Department of Economic Development, through the Assistant Director of the Office of Industry and Community Relations, stated that "Smith conveyed by deed dated July 2, 1700 to the tribe 175 acres to the said Indians," and that "[t]he language of the [1700] conveyance expresses an intent to grant an Indian tribe the right to possess land and to render the land inalienable." (9/3 Tr. at 126; Ex. 234.) Mr. Lynch addressed this evidence by stating it was not contrary to his testimony. (9/8 Tr. at 192.)

Chief Wallace testified that the land trustees are responsible for managing the current land occupied by the Unkechauge Nation and dividing it for members to live and build on. (9/4 Tr. at 112-13.) Chief Wallace stated that the tribe has evicted individuals from the reservation. (9/4 Tr. at 113.) Additionally, Dr. Strong cited evidence of such evictions in 2000. (9/3 Tr. at 147; Exs. 273, 275.) Under New York's Indian law, Section 8, New York gave Indian tribes access to New York courts to evict individuals from the reservation. In such circumstances, the tribe submits a resolution to the district attorney indicating that a particular individual is an intruder. (9/4 Tr. at 113-115.)

**DISCUSSION**

### III. Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). Defendants motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure asserts that the court lacks subject matter jurisdiction because defendants are immune from suit by virtue of the Unkechauge's status as an Indian tribe, by which the tribe and its arms enjoy sovereign immunity. Issues of sovereign immunity are properly addressed in a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. See, e.g., Garcia v. Akwesasme Hous. Auth., 268 F.3d 76, 84 (2d Cir. 2001).

The general rule is that a plaintiff has the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists. Makarova, 201 F.3d at 113. In reviewing a motion to dismiss under Rule 12(b)(1), the court "must accept as true all material factual allegations in the complaint, but [should] not . . . draw inferences from the complaint favorable to plaintiffs." Attica Cent. Schs., 386 F.3d at 110 (citation omitted).

Consistent with this general principle, the Second Circuit has stated that "[o]n a motion invoking sovereign immunity to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of proving by a preponderance of evidence that jurisdiction exists." Garcia, 268 F.3d at 84. In Garcia, the Second Circuit placed the burden on the plaintiff to show either that Congress has abrogated tribal immunity or that the tribe has waived it. Id. at 84-87. The Garcia parties conceded that the defendant entities were arms of the tribe, id. at 84, and the court did not address whether the "tribe" was properly designated as such under federal law.

The present action is distinguished from Garcia because the parties dispute whether the Unkechauge is a "tribe" pursuant to federal law. On the issue of tribal status, it is the Unkechauge that bears the burden. Similarly, the Poospatuck Smoke Shop must establish, by a preponderance of evidence, that it is an arm of the Unkechauge, and thus entitled to immunity. Once the defendants' burdens are met on these preliminary issues, the plaintiff bears the burden to establish jurisdiction by showing either waiver or abrogation of immunity. See Garcia, 268 F.3d at 84; see also Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Ed., 466 F.3d 232, 237 (2d Cir. 2006) ("the governmental entity invoking . . . Eleventh Amendment [immunity] bears the burden of demonstrating that it qualifies as an arm of

the state entitled to share in its immunity.") (emphasis
omitted); City of New York v. Golden Feather Smoke Shop, No. 08-
cv-3966 (CBA), 2009 U.S. Dist. LEXIS 20953, at *13 (E.D.N.Y.
Mar. 19, 2009) (stating that the reasoning in Woods "applies
with equal force in the case of a party claiming tribal
sovereign immunity as an 'arm of the tribe.'").

IV. **Sovereign Immunity**

"As a matter of federal law, an Indian tribe is
subject to a suit only where Congress has authorized the suit or
the tribe has waived its immunity." Kiowa Tribe of Oklahoma v.
Mfg. Techs., Inc., 523 U.S. 751, 754, (1998). Although the
Supreme Court has recognized that there might be "reasons to
doubt the wisdom of perpetuating the doctrine [of tribal
sovereign immunity]," the Supreme Court has consistently
"defer[red] to the role Congress may wish to exercise" in
"abrogat[ing] tribal immunity." Id. at 758.

For the Unkechauge Nation to enjoy sovereign immunity
it must be a tribe as recognized by federal law. Pursuant to
federal law, a group of Indians is a tribe – and therefore
enjoys sovereign immunity – if it either 1) has been federally
recognized by Congress or the BIA, or 2) meets the federal
common law definition first articulated by the Supreme Court in
Montoya v. United States, 180 U.S. at 266. See United States v.

_Sandoval_, 231 U.S. 28, 47 (1913); _Native Village of Tyonek v._
_Puckett_, 957 F.2d 631, 635 (9th Cir. 1992).  The parties agree
that the Unkechauge Nation has not been federally recognized by
the BIA or Congress and does not enjoy tribal status on that
basis.  The parties dispute, however, whether the Unkechauge
Nation enjoys tribal status pursuant to federal common law.

    For the reasons that follow, and in light of the
extensive evidence presented, the court finds that the defendant
Unkechauge Nation has met its burden of establishing, by a
preponderance of the evidence, that the _Montoya_ criteria are
satisfied and that the Unkechauge Nation is a "tribe" pursuant
federal common law.  Based on the court's finding, the
Unkechauge enjoys sovereign immunity unless it has been waived
or abrogated by Congress.  "[A] waiver of sovereign immunity
cannot be implied but must be unequivocally expressed."  _Santa_
_Clara Pueblo v. Martinez_, 436 U.S. 49, 58 (1978).  There is no
evidence in the record of a waiver or congressional abrogation
of the Unkechauge's tribal immunity.  Thus, the defendants'
motion to dismiss for lack of subject matter jurisdiction
pursuant to Rule 12(b)(1) is granted with respect to the
Unkechauge Nation and Chief Harry Wallace, to the extent that he
is sued in his capacity as a senior tribal official.[7]

_____

[7]    In the court's December 22, 2006 Order, Judge Amon held
that because Chief Harry Wallace was sued in his official

The court's determination with respect to the
Unkechauge Nation's immunity is necessary but not sufficient for
a finding of immunity of the defendant Smoke Shop.  As stated
above, the burden of proof for an entity asserting immunity as
an arm of a sovereign tribe is on the entity to establish that
it is, in fact, an arm of the tribe.  This court previously set
forth a series of factors courts use to determine whether an
entity is an arm of a tribe.  (See Dkt. No. 29.)  As discussed
fully below, the Poospatuck Smoke Shop has not met its burden as
to any of these factors and is not entitled to immunity.

### A. Whether the Court Has Jurisdiction to Determine Tribal Status for the Purpose of Tribal Immunity

As a threshold matter, the plaintiff questions, for
the first time in its post-hearing memorandum, whether this
court has jurisdiction to decide the issue of tribal status.
The court implicitly decided this issue in the affirmative in
its order of December 22, 2006, directing discovery and an
evidentiary hearing on the issue of tribal status, from which
the plaintiff never made a motion for reconsideration, but,

---

capacity, or for actions within his tribal authority, if the
Unkechauge Nation is immune from suit, Chief Wallace is likewise
immune, as the complaint read at that time.  The plaintiff's
Second Amended Complaint, filed on August 18, 2008, asserts
claims against Chief Wallace in his official and individual
capacities, as the Chief of the Unkechauge and owner of the
Poospatuck Smoke Shop.  (Dkt. No. 142.)

instead, subsequently participated in the extensive and costly tribal status hearing.  The court, however, will address this issue as the requirement that jurisdiction be established "springs from the nature and limits of the judicial power of the United States."  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998) (citation and quotations omitted).

The Supreme Court has not had occasion to determine tribal status of a group of Indians for the purpose of applying tribal sovereign immunity.  However, the Supreme Court has determined tribal status for the purpose of answering, inter alia, whether a group of Indians is a "tribe" as contemplated by the Non-Intercourse Act, 2 Stat. § 528, et seq.  See United States v. Candelaria, 271 U.S. 432 (1926); Montoya, 180 U.S. 261 (1901).  "[The Supreme] Court has taken the lead in drawing the bounds of tribal immunity[.]  Congress, subject to constitutional limitations, can alter its limits through explicit legislation."  Kiowa, 523 U.S. at 759; see also Candelaria, 271 U.S. at 440-442.  The authority to determine tribal status – a prerequisite for the enjoyment of immunity – necessarily is inherent in the judiciary's authority to "draw[] the bounds of tribal immunity."  Kiowa, 523 U.S. at 759. Nonetheless, the court is mindful of the inherent nature of tribal sovereign authority, which "'predates federal recognition – indeed, it predates the birth of the Republic,'" (Dec. 22,

2006 Order (quoting <u>Rhode Island v. Narragansett Indian Tribe</u>, 19 F.3d 685, 694 (1st Cir. 1993)).).

In light of the Supreme Court's deference to Congress in the arena of Indian affairs and the judicial role in drawing the bounds sovereign immunity, lower courts acknowledge their jurisdiction to determine tribal immunity unless and until Congress acts on the issue. <u>See</u> <u>Arakaki v. Lingle</u>, 477 F.3d 1048, 1067-1068 (9th Cir. 2007) (holding that Congress' silence on tribal status did not preclude the district court from determining what level of scrutiny should be applied in an Equal Protection claim by an Indian tribe, even though the level of scrutiny applied depended on the tribe's status); <u>United States v. Washington</u>, 641 F.2d 1368, 1371 (9th Cir. 1981) ("<u>Washington II</u>") (stating that non-recognition of a tribe may result in loss of statutory benefits, but will have no impact on vested treaty rights; only Congress, not the Department of the Interior, can abrogate an Indian treaty); <u>Golden Hill Paugussett Tribe of Indians v. Rell</u>, 463 F. Supp. 2d 192, 200-201 (D. Conn. 2006) (applying collateral estoppel to preclude the Indian group from demonstrating in a lawsuit that it was an Indian tribe after the BIA denied recognition); <u>Masayesva v. Zah</u>, 792 F. Supp. 1178, 1183-1185 (D. Az. 1992) ("even though modern law may not treat tribal existence as a political question, as such, it is clear

that most courts give great deference to congressional and executive determinations of tribal status").

Like the Supreme Court, the Second Circuit has not had occasion to determine tribal status in the specific context of an assertion of tribal sovereign immunity.  The Second Circuit has held that a court should not make a determination of tribal status when the purported tribe has an application for federal recognition pending with the BIA, but the Second Circuit has "not decid[ed] whether deference would be appropriate if no recognition application were pending . . . ."  <u>Golden Hill Paugussett of Indians v. Weicker</u>, 39 F.3d 51, 60 (2d Cir. 1994).  The Second Circuit did not foreclose the judiciary's role in making such a determination when there is no application pending with the BIA, acknowledging that federal courts have jurisdiction to determine tribal status, and noting that "[w]here an executive agency and the federal courts have overlapping, though not identical, jurisdiction, judicial authority is often exercised <u>in conjunction</u> with the administrative."  <u>Id.</u> at 54 (emphasis added).  The Second Circuit further noted that the "formulation of [the <u>Montoya</u>] standard and its use by the federal courts occurred after Congress delegated to the executive branch the power to prescribe regulations for carrying into effect statutes relating to Indian affairs, and without regard to whether or not the

particular group of Indians at issue had been recognized by the Department of the Interior." Id. at 59 (citing 25 U.S.C. § 9; Candelaria, 271 U.S. at 442; Catawba Indian Tribe v. South Carolina, 718 F.2d 1291, 1298 (4th Cir. 1983); Joint Tribal Council of the Passamaquoddy Tribe v. Morton, 528 F.2d 370, 377 (1st Cir. 1975)).

A court in this district has exercised jurisdiction to determine tribal status in a case, like this one, in which a determination of tribal status was necessary to decide an issue in the case: whether the Shinnecock could construct a casino on Shinnecock land. See New York v. Shinnecock Indian Nation, 400 F. Supp. 2d 486, 487 (E.D.N.Y. 2005) ("2005 Shinnecock"); see also New York v. Shinnecock, 523 F. Supp. 2d 185, 188 n.1 (E.D.N.Y. 2007) (noting that the 2005 Shinnecock court determined that the Shinnecock Indian Nation satisfied the federal common law standard for tribal recognition).

A subsequent case in this district, Shinnecock Indian Nation v. Kempthorne, No. 06-cv-5013 (JFB) (ARL), 2008 U.S. Dist. LEXIS 75826, at *5 (E.D.N.Y. Sept. 30, 2008), acknowledged the validity of the district court's exercise of jurisdiction to recognize the tribe in 2005 Shinnecock, although the Kempthorne court ultimately held that it should defer deciding tribal recognition of the Shinnecock in the case before it because the Shinnecock had a pending recognition application with the BIA.

60

Kempthorne, 2008 U.S. Dist. LEXIS 75826 at *5 ("the [2005
Shinnecock] Court clearly had the authority to determine the
common law tribe issue for purposes of deciding the limited
issue before it").  In Kempthorne, the Shinnecock was awaiting
BIA determination of its federal recognition petition, filed in
1978, and sued the Secretary of the Department of the Interior
for violations of the Administrative Procedures Act and Due
Process.  Id. at *2.  With regard to the issue of federal
recognition, the court held that "although the [2005 Shinnecock]
Court could and did determine common law tribal status in order
to decide the issues presented in the casino litigation, that
determination has no binding effect on the BIA."  Id. at *53.
Kempthorne distinguished federal recognition through common law
from recognition through the BIA, holding that the recognition
by the 2005 Shinnecock court "was not meant to encompass
recognition for purposes of obtaining federal benefits."  Id. at
*60; see also Golden Hill, 39 F.3d at 59.  The exercise of
federal court jurisdiction to determine tribal status in cases
in which the tribe has no pending federal recognition
application with the BIA and in which the resolution of a
group's status is necessary to deciding an issue before the
court does not encroach on the political branch's authority over
Indian affairs and is consistent with the judiciary's authority

to "draw[] the bounds of tribal immunity." <u>Kiowa</u>, 523 U.S. at
759.

The district courts' jurisdiction to determine tribal
status when necessary to decide an issue presented in the
litigation gleans further support from courts outside of the
Second Circuit.  In <u>Native Village of Tyonek v. Puckett</u>, 957
F.2d 631, 635 (9th Cir. 1992), the Ninth Circuit recognized
federal court jurisdiction to determine tribal status when it
remanded the case to the district court on the issue of whether
the group constituted a "tribe" for purposes of sovereign
immunity against counterclaims.  The Ninth Circuit acknowledged
that an Indian community constitutes a tribe if it either 1) is
recognized as such by the federal government, or 2) satisfies
the common law test under <u>Montoya</u>.  <u>Id.</u> at 634-636 (additionally
requiring, under the common law test, that the community is a
"modern day successor" to a historical sovereign entity).  <u>See
also</u> <u>Alaska v. Native Village of Venetie</u>, 856 F.2d 1384, 1387
(9th Cir. 1988) (contemplating several ways in which a tribe
could be recognized); <u>see also</u> <u>Native Village of Venetie I.R.A.
Council v. Alaska</u>, Nos. F86-0075 CIV (HRH0), F87-0051 CIV (HRH),
1994 WL 730893, *22 (D. Alaska Dec. 23, 1994) (finding that a
group of Indians satisfied the common law definition of a tribe
pursuant to <u>Montoya</u> and enjoyed sovereign immunity.)

Furthermore, when the issue of common law tribal recognition came before the First Circuit, the court acknowledged without questioning the court's jurisdiction to determine tribal status. Bottomly v. Passamaquoddy Tribe, 599 F.2d 1061, 1064-1065 (1st Cir. 1979). In Bottomly, the First Circuit explicitly stated that it was not deciding whether the Passamaquoddy Indians are a "tribe" because the plaintiff had asserted claims against the tribe as an entity. Instead, the First Circuit assumed the tribal status of the Passamaquoddy "for purposes of deciding the issue squarely raised by this suit: whether this particular tribe enjoys . . . sovereign immunity" because the contract at issue in the case "clearly [was] entered into with the Tribe as a tribe." Id. at 1063-1064. The First Circuit rejected the argument that the tribe was not entitled to sovereign immunity protection because it had not been federally recognized by the BIA or Congress. Id. at 1064-1065; see also Morton, 528 F.2d at 378-379 (determining that a group of Indians is a tribe for purposes of the Non-Intercourse Act). Additionally, the First Circuit presumed the validity of the district court's exercise of jurisdiction to determine tribal status in Mashpee Tribe v. New Seabury Corp., 447 F. Supp. 940 (D. Mass. 1978) ("Mashpee I"), in which a jury found that the tribe had not satisfied the Montoya criteria. Mashpee Tribe v. Sec. of the Interior, 820 F.2d 480, 482 (1st

Cir. 1987) ("Mashpee II").  The First Circuit held that the
district court's determination against tribal status in Mashpee
I had a res judicata effect on the subsequent litigation, and
articulated why the Montoya criteria were not satisfied.  Id. at
482-483.

In light of the foregoing, the question of the
Unkechauge Nation's tribal status falls squarely within the
court's jurisdiction.  The Unkechauge has never been rejected
from BIA recognition and has no pending BIA application.
Additionally, the Unkechauge is not affirmatively seeking
federal recognition from this court in an attempt to circumvent
the administrative process prescribed by Congress.  Instead, the
Unkechauge defendants seek this court's determination of the
Unkechauge Nation's tribal status because it is necessary to
resolve a critical issue arising from their status as defendants
in this case: whether the Unkechauge enjoys sovereign immunity
from suit.  Put another way, a determination of tribal status
will resolve whether the court has subject matter jurisdiction
over plaintiff's claims against the Unkechauge Nation, a
threshold question the court must answer in each case before it.
See Steel, 523 U.S. at 94 ("'the first and fundamental question
is that of jurisdiction . . . . This question the court is bound
to ask and answer'") (citation omitted).  Consequently, the
court's jurisdiction to determine tribal status in this case is

necessary to ensure that the court is ultimately acting within the limits of its Article III power.  See id.  The court notes, however, that common law recognition of tribal status by the court is distinct from recognition by the BIA for the purpose of, among other things, obtaining the benefits of federal statutes governing the United States' relationship with Indian tribes.  Accord Kempthorne, 2008 U.S. Dist. LEXIS 75826 at *49-51.  Instead, the court's determination of tribal recognition through common law is necessary to determine the court's jurisdiction over the claims against the Unkechauge in the matter currently before the court.

### B. The Unkechauge Nation's Tribal Status Pursuant to Federal Common Law

As the court can properly decide the question of the Unkechauge's tribal status, it now turns to the resolution of this issue.  The court previously found that the criteria set forth by the Supreme Court in Montoya is the correct standard for the court to employ when deciding tribal status.  Indeed, as stated above, recognition through federal common law, i.e. application of the Montoya criteria, is one way to determine tribal status, and the only way courts have done so.  Pursuant to the Montoya criteria, defendant Unkechauge Nation has the burden to establish that it is "[1] a body of Indians of the same or similar race, [2] united in a community under one

leadership or government and [3] inhabiting a particular though sometimes ill-defined territory." Montoya, 180 U.S. at 266.

Before the court embarks on its evaluation of the Montoya criteria, however, it notes the peculiar context of a Montoya analysis. Not only is "[t]he concept of tribes as legal entities [] purely European," L. Scott Gould, Mixing Bodies and Beliefs: The Predicament of Tribes, 101 Colum. L. Rev. 702, 718 (2001), but the Montoya criteria for defining a "tribe" were neither established nor defined by Native Americans. If an essential right of a sovereign entity is to determine the bounds of its own citizenship, it is conceptually inconsistent for the court to determine the group identity of that sovereign without reference to the group's self-defined criteria. As a result of this disconnect, the court recognizes that the Montoya criteria do not necessarily conform to the realities of the people who are required to meet them. In adapting to the form of tribal identity imposed by these criteria, Indian tribes might, in fact, be losing a part of their identity. See Dan Gunter, The Technology of Tribalism: The Lemhi Indians, Federal Recognition, and the Creation of Tribal Identity, 35 Idaho L. Rev. 85, 122 (1998).

Furthermore, "[f]ederal policy has sometimes favored tribal autonomy and sometimes sought to destroy it." Washington II, 641 F.2d at 1373. "During the latter part of the 19th

century and early part of the 20th century it was the policy of

the United States Government to encourage the breaking up of

Indian reservations and destruction of tribal relations and to

settle Indians upon their own allotments or homesteads,

acculturate and incorporate them into the national life, and

deal with them not as nations or tribes or bands but as

individual citizens."  United States v. Washington, 476 F. Supp.

1101, 1103 (W.D. Wash. 1979) ("Washington I").  With the Indian

Reorganization Act of 1934 ("IRA"), this federal policy was

changed.  The IRA was "directed at implementing a policy of

organizing and strengthening Indian tribal entities so as to

manage their own affairs and to promote their civic and cultural

freedom and opportunity and their own economic rehabilitation."

Id.  After passage of the IRA in 1934, the Department of the

Interior began recognition proceedings because the benefits

under the IRA were available only to descendants of "recognized"

tribes.  Golden Hill Paugussett Tribe, 39 F.3d at 57.[8]

          Against the backdrop of these conflicting practices of

the federal government with regard to Indians, the court finds

application of the Montoya criteria problematic.  Nevertheless,

the court is bound by precedent to apply the Montoya criteria

for tribal recognition pursuant to federal common law.

_____

[8]       It was not until 1978 that the Department of the Interior
and the BIA promulgated regulations to establish a uniform
procedure for BIA recognition of American Indian tribes.

Moreover, particularly considering that the parties have engaged in extensive discovery and a lengthy hearing in anticipation of Montoya's application, the court declines to formulate an alternative test at this juncture, even if it had the authority to do so. Nevertheless, the court's analysis proceeds mindful of the context noted above. For the following reasons, and in light of the parties' submissions, the court finds that the Unkechauge Nation has met its burden to establish by a preponderance of evidence that all three of the Montoya criteria are satisfied.

### i. A Body of Indians of the Same or Similar Race

The first Montoya criterion is whether the Unkechauge Nation is a "body of Indians of the same or similar race." Through their experts, the parties dispute the meaning of the term "race" as used by Justice Brown in the 1901 Montoya decision. Plaintiff asserted that race was understood by Justice Brown to mean that each individual tribe constituted a distinct race, and thus contended that the Unkechauge has intermixed with other groups to the extent that they are not of the same or similar race. Defendants asserted that Justice Brown understood race to be broad categories of classification then in use: "Caucasoid, Mongoloid, Negroid, Australoid, etc."

Ultimately, the court can only guess which of these definitions of race, if either, Justice Brown was using when applying this first criterion. Since the Montoya decision, more than one-hundred years have informed and transformed conventional as well as scientific understandings of race in America, and, to the extent that commentators have noted that the notion of race is "to a significant extent [a] cultural construct[]," see Scott C. Idleman, Mulitculturalism and the Future of Tribal Sovereignty, 35 Colum. Hum. Rts. L. Rev. 589, 598-99 (2004), the court need not determine which definition of race was used by Justice Brown in Montoya. Regardless of what Justice Brown's definition of "race" was, to blindly apply a concept of race from 1901 would revert to scientific and social perspectives long since abandoned and would fail to keep developments of the law at pace with developments in society and science.

Furthermore, the definitions of race espoused by the experts in this case do not adequately account for the theory that historically, "[r]ace, if it was even understood by Indians in the Anglo-European context, was not a prerequisite for joining [a tribe]." Gould, supra, 101 Colum. L. Rev. at 720. Rather, it was the federal government that "introduced the concept of race as the essential criterion for membership." Id.

at 719-720.  As such, the experts' definitions are not informed by a particular tribe's self-defined criteria.

Therefore, instead of adopting the definition of race proposed by either expert, the court finds instructive the Montoya analysis in Venetie, 1994 WL 730893 at *1.  The Venetie court focused on whether, based on anthropological and historical data, an Indian group was 1) identified as a separate and distinct group of Indians at various points between its first contact with Europeans and the present and 2) whether the group at present descended from common ancestors.  Id. at *13 (finding that ninety-nine households descended from thirteen families, but not addressing the blood quantum of the individuals).

The court finds that analyzing race based on how a particular Indian group was and is perceived within its own group and by the dominant culture acknowledges different and evolving definitions of race in different contexts and throughout the centuries, thereby acknowledging the notion of race as a social construct.  Furthermore, by considering common ancestry of the group as a whole, in addition to the blood quantum or other criteria required by a tribe for its members, and de-emphasizing strict biology as a measure of race, the court may incorporate a tribe's self-defined criteria into its

consideration of the <u>Montoya</u> criterion "of the same or similar race."

Abundant evidence in the record establishes that the Unkechauge was identified as a separate group of Indians by, and at the time of the first historical contact with, Europeans. Similarly, the evidence establishes that the Unkechauge self-identified as a distinct group. The numerous agreements in the record between the Unkechauge and colonists support a finding that both the Unkechauge and the colonists perceived the Unkechauge as a distinct group. As described above, this evidence includes, but is not limited to, land conveyances in April 1655 by Sachem Warawakmy and allied tribal headmen, including Sachem Mahue of the Unkechauge Nation (Ex. 7, 8), and in the 1700 conveyance. The court finds that, based on Dr. Strong's testimony that Indians inhabited and used land communally rather than as individuals, this conveyance was to the eleven individuals in their representative tribal capacities. Furthermore, the Unkechauge granted colonists the rights to beached whales on its territorial shores. (Ex. 1 at 31-32; Exs. 18, 19.) Additionally, Thomas Jefferson's visit to Poospatuck in the late 1700s and his compilation of Unkechauge vocabulary (Ex. 72) further corroborates that the Unkechauge was identified as a distinct group from the time of first contact and thereafter.

Defendants presented additional evidence, discussed extensively above, that the Unkechauge was identified as a separate group of Indians throughout the centuries.  For example, in 1875, New York State established a Poospatuck school and, in 1915, the Poospatuck appeared on the Department of the Interior's list of "Indian Populations in the United States." Furthermore, in the latter half of the twentieth century, Unkechauge children were admitted to New York State schools and regarded as Indians.  Newspapers from 1895 (Ex. 103) to the present reported on Poospatuck affairs.  Furthermore, an example of the Unkechauge self-identify as a distinct group is evidenced by the eviction proceedings brought in Suffolk County court against individuals residing on the Unkechauge reservation who were not Unkechauge.  (Exs. 273, 275.)  Furthermore, the 1995 letter from Chief Justice Williams stating that the Unkechauge maintained political and economic relations with the Six Nations establishes that the Unkechauge was perceived as a distinct group by other tribes, the British and the United States, during and after the colonial era and Revolutionary War.  (Ex. 255.) Although the court notes the limited documentary evidence of a group identified as Unkechauge during the 1800s, it finds Dr. Strong's and Chief Wallace's explanation for this lack of evidence satisfactory.  Fewer documents reflecting land transactions with the Unkechauge exist because there were fewer

land transactions during the period.  Moreover, Chief Wallace testified that the church at Poospatuck, established in 1750, held tribal records that were lost with the church in a fire in the mid-1980s.  Additionally, many of the Unkechauge's cultural and religious practices were driven underground and were not regularly reported by observers and newspapers.

The Unkechauge has also established by a preponderance of the evidence that the present day Unkechauge share a common ancestry with the pre-historic Unkechauge, as dicussed by the Venetie court.  Indeed, although the parties' experts dispute whether the members of the modern-day Unkechauge have a sufficient blood quantum to satisfy the first Montoya criterion, the court finds that the present day Unkechauge share a common ancestry with the pre-historic Unkechauge.  In this case, where the Unkechauge has a "one drop" requirement and procedure for determining blood quantum membership, the court finds credible Chief Wallace's testimony that the approximately 200 present-day inhabitants of the Poospatuck reservation satisfy the Unkechauge membership requirements.

Additional evidence that the present day Unkechauge share common ancestry with the Unkechauge includes Dr. Strong's testimony that specific Unkechauge individuals listed on documents from 1874, 1935 and 1982 establish the Unkechauge lineage through the decades, and Ms. Davis' testimony that the

conditions precedent for establishing Unkechauge ancestry for

"many" modern-day Unkechauge, including the Davis family,

Edwards family, and Chief Wallace, were satisfied.

Additionally, in his 1936 Dana decision, Judge Hawkins

acknowledged the Unkechauge ancestry of families who sought to

remain on land from which Dana attempted to evict them.

Furthermore, an exhaustive hearing was held and a determination

made in New York Surrogate's Court in Treadwell which

established the blood rights of the Unkechauge in 1983.

Finally, Chief Wallace testified as to his own lineage, tracing

it back to individuals involved in the original land transfers

with the colonists.

As further evidence that the present-day Unkechauge

share a common ancestry with the Unkechauge at the time first

of first contact, the court finds persuasive ceremonial and

celebratory practices throughout the centuries, such as the

making of wampum and the June Meeting.  Additionally, Dr.

Strong's testimony regarding migration and settlement patterns

of the Algonquin peoples support the court's finding that the

Unkechauge presently residing at Poospatuck share a common

ancestry with those who inhabited the area from pre-historic

times.

The court finds that a preponderance of the evidence

establishes that the Unkechauge was identified as a distinct

group from the time of first contact to the present and that the present members share a common Unkechauge ancestry.  On this basis, the court finds that the Unkechauge of Poospatuck is a group of Indians of the same or similar race.

   ii.   United in a Community Under One Leadership or Government

        The second Montoya criterion, "united in a community under one leadership or government," is a construct of the dominant government, not necessarily a criterion of the Indian group to whom it is applied.  See Gould, supra, 101 Colum. L. Rev. at 718.  Application of Montoya's "united in a community under one leadership or government" criterion "require[s] considerable flexibility and understanding with respect to changes within native groups over time and differences between native groups in different parts of the country." Venetie, 1994 WL 730893 at *14.  Indeed, "change in any community is essential if the community is to survive.  Indian tribes in modern America have had to adjust to life under the influence of a dominant non-Indian culture." Washington II, 641 F.2d at 1373.  "A degree of assimilation is inevitable . . . and does not entail abandonment of distinct Indian communities." Id.  "[A]daptation to the ways of non-natives does not destroy tribal status unless the [tribal members] have become fully assimilated into a non-native culture." Venetie, 1994 WL 730893 at *15 (citing Venetie

I.R.A. Council v. Alaska, 944 F.2d 548, 557 (citing Washington II, 641 F.2d at 1373)).

Montoya offers no authoritative or specific insight into the concept of a "community under one leadership" as a factor of tribal existence. In addition to the Montoya factors, the Ninth Circuit in Native Village of Tyonek, 957 F. 2d at 635 (9th Cir. 1992), considered whether a group claiming tribal status is the "modern day successor" to a historical sovereign entity that exercised at least the minimal functions of a governing body. The Venetie court required that the purported tribe "must demonstrate that their people are joined together as a unit through beliefs, way of life, or the like which go beyond just ethnicity and place of residence." Venetie, 1994 WL 730893 at *15. Additionally, the Venetie court evaluated the "nature and extent of leadership or governance as it related to things of importance in the life of the [purported tribe]" and "how leadership passed and how government evolved." Id. at *14-15. As the Venetie court noted, "leadership without a community to lead is meaningless and ignores the realities of man's political nature. . . . [T]he amount of government which must be established is to be determined in relationship to the ["perceived needs of the community"]." Id. at *14.

The parties do not dispute that the Unkechauge was a community at its inception, or that a "community" presently

exists.  Instead, plaintiff's expert asserts that, by 1800, the community had deteriorated and ethnic and social attributes distinguishing the Unkechauge had broken down so much so that the present community is not a "tribal community."  (See 9/8 Tr. at 77.)  The court finds the testimony of plaintiff's expert, Mr. Lynch, on this Montoya criterion particularly results-driven.  It appears that Mr. Lynch ultimately chose what evidence to rely on and the weight to be given that evidence based on whether it supported his client's position and his ultimate conclusions.  According to plaintiff's expert, the lack of evidence establishing a tribal community warrants the conclusion that there is no community with leadership. Plaintiff's expert listed the types of evidence that would be relevant in establishing an Indian community with leadership, including petitions, correspondence with government officials, and records of meetings between local leadership and tribal leadership.  (9/8 Tr. at 124.)  The court notes that such evidence, as described above, even after 1800, is extensively presented in the joint exhibits before the court and thus rejects the conclusions of plaintiff's expert that the Unkechauge is not a united tribal community under one leadership or government.  (See, e.g., Ex. 83 at 3, 12; Ex. 87-88, 100, 101, 103-106, 113, 115-121, 123-124, 128, 142, 143.)

The court finds persuasive and abundant evidence of the Unkechauge's relations with other tribes, colonists, and the New York State and federal government. Among these instances was the New York Colonial Governor's mediation of a land dispute between the Unkechauge and the Shinnecock in 1667 (Ex. 1 at 22-23; Ex. 16), and a petition by the Unkechauge to the governor regarding whaling and fishing rights in 1676 and the encroachment of colonists on Indian lands. (Ex. 1 at 33; Ex. 27.) Additionally, defendants' expert testified that the land conveyances between the colonists and certain Unkechauge in the 1700s were with the Unkechauge members acting in a representative tribal capacity. In 1774, the treaty between the United States and the Six Nations Iroquois included the Iroquois' friends, which was determined to include the Unkechauge by the Seneca Nation's court of appeals in 1995.

There is also evidence of cohesive concerted tribal action in the late 1800s. Under the leadership of Chief Jacob Ward, the Poospatuck community petitioned New York State for a school in 1874. In 1888, the Unkechauge held an election for trustees. Although this is the extent of evidence from Unkechauge sources documenting the existence of a community and governance in the 1800s, the court is satisfied with the Unkechauge expert's explanation as noted above: the lack of documents by North American Indian tribes in general, fewer land

transactions, and the loss of tribal records stored in the Unkechauge church rectory due to a fire in approximately 1987.

Moreover, the evidence from 1665 through the present suggests that the Unkechauge government was responsive to the "perceived needs of the community." Venetie, 1994 WL 730893 at *14. Although the Unkechauge government was less active as of the 1800s than it had been since the arrival of the colonists, the Unkechauge at Poospatuck remained sufficiently intact to rebuild its community and formalize its procedures for governance following the federal government's abandonment of its assimilation policies in the 1930s. Thus, the existing Unkechauge governance sufficiently responded to the needs of the community. Additionally, to the extent that plaintiff's expert identifies changes to the Unkechauge's social structure and religion, the court finds that these adaptations do not destroy tribal status. See Venetie, 1994 WL 730893 at *15.

There is additional evidence of the Unkechauge community with leadership in the 1900s. In 1935, meeting minutes for the Town of Brookhaven reveal that Unkechauge members voiced opposition to the Unkechauge school's closing. In the late 1950s, the Unkechauge adopted a Constitution. Evidence before the court suggests that, starting in about 1970, the Unkechauge's political and social organization was formalized. In the late twentieth century, there are several

instances of the State of New York acknowledging the Unkechauge
in the contexts of fishing and hunting rights (1972),
recognition of residence and boundaries (1974), and
incorporation of the Unkechauge Constitution into the laws of
New York State (1982).  There is evidence of cultural activities
and efforts to improve housing on the reservation by Chief
Treadwell.  After 1983, the Unkechauge implemented a more
structured system of governance that includes an elected tribal
council in addition to a Chief.  Chief Wallace, who has been
Chief of the Unkechauge for fifteen years, implemented a system
of record keeping, maintenance of the land and the community
center, and prioritized the revival of traditional practices.
Additionally, evidence that the Unkechauge tribal council works
with the District Attorney to evict people who are not
Unkechauge from its land demonstrates that there is modern-day
leadership.  (Exs. 273, 275.)

        Finally, the court notes evidence of individuals
holding the position of Chief from the early 1800s through the
present.  The Chiefs included William Cooper (circa 1812),
"Queen" Elizabeth ("Betty") Job (circa 1830), "Queen" Caroline
Hannibal (circa 1830-1850), Paul Ward (died 1888), Jacob Ward
(circa 1874), Richard Ward (circa 1874-1902), Horace Ward (circa
1933), Edward Treadwell (circa 1966-1981), Junius Langhorne

(circa 1981-1991), and Harry Wallace (1991-present).  (Ex. 1 at
68, 74; Exs. 80, 104-106, 113.)

        Ample evidence compels this court to find that the
Unkechauge is, and has been, "united in a community under one
leadership or government."  Thus, the second Montoya criterion
is satisfied.

        iii.    Inhabiting a Particular, Though Sometimes Ill-
                defined Territory

        The final Montoya criterion is whether the Unkechauge
occupies a "particular, though sometimes ill-defined territory."
This criterion does not require ownership or possession of land
and "specific boundaries need not be drawn."  Venetie, 1994 WL
730893 at *14; see also 2005 Shinecock, 400 F. Supp. 2d at 498
(finding that plaintiff had resided for many years on a
territory "claiming under lease, and later under a deed" and
satisfied the Montoya criteria).  Furthermore, "some out-
migration of members is not proof that a particular tribe does
not occupy a particular area."  Id.

        The extent to which the Unkechauge territory has
decreased in size since the Unkechauge's first contact with
colonists, or was occupied by the Unkechauge pursuant to a
number of agreements with the Europeans, is not determinative of
whether this Montoya factor is satisfied.  Nor does the court
accept plaintiff's position that the fifty acres occupied by the

                              81

Unkechauge is insufficient to be deemed a "territory" within the meaning of Montoya. Neither the definition of "territory" nor the use of that term in Montoya suggests that a group of Indians must inhabit a geographic area of a particular size. Indeed, the 2005 Shinnecock court determined that the Shinnecock, which occupies a one-hundred acre reservation in Long Island, satisfied the Montoya criteria. 2005 Shinnecock, 400 F. Supp. 2d at 498-99.

Based on undisputed evidence discussed above, the court finds that the Unkechauge has historically inhabited and currently inhabits a particular territory along the bank of the Poospatuck Creek on the southern shore of what is now Brookhaven in Long Island, New York. This evidence includes land transactions between the Unkechuage and the colonists dated in 1692, 1700 and 1730, and the 1936 Dana decision establishing the Unkechauge ancestors' right to continued occupancy of the land referenced in those transactions. Additionally, there is evidence of specific events at Poospatuck and accounts from visitors and historians that document the Unkechauge presence throughout the centuries. These include Missionary Azariah Horton's proselytizing trips to Poospatuck in the 1740s, Jefferson's visit in 1791, newspaper articles from 1845 and 1871 reporting on June Meeting at Poospatuck, the construction of the school at Poospatuck in 1875, the 1935 Directory and Yearbook of

the Public School's notation that "Poospatuck is a community of itself," and eviction proceedings against non-Unkechauge individuals residing at Poospatuck in 1999.  Indeed, the parties' experts agree that the Unkechauge has consistently occupied this territory since at least the time of first contact.  That they disagree as to whether the Unkechauge historically occupied this territory as owner or as lessee is irrelevant as to whether the Unkechauge's presence at Poospatuck satisfies the <u>Montoya</u> criterion "inhabiting a particular, though sometimes ill-defined territory."

In light of the foregoing analysis of the evidence, the court finds that defendants have established by a preponderance of the evidence that the three <u>Montoya</u> criteria are satisfied.  Consequently, the Unkechauge meets the common law definition of a "tribe" and is entitled to immunity from suit in the present action.  "Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers." <u>Turner v. United States</u>, 248 U.S. 354, 358 (1919).  Supreme Court cases "recognize that the Indian tribes have not given up their full sovereignty" which is "of a unique and limited character.  It exists only at the sufferance of Congress and is subject to complete deference.  But until Congress acts, the tribes retained their existing sovereign powers." <u>United States v.</u>

Wheeler, 435 U.S. 313, 322-323 (1978).  There is no evidence

that the Unkechauge waived or abandoned their tribal immunity or

that Congress has abrogated the immunity of the Unkechauge.

Because the Unkechauge is a tribe pursuant to federal common

law, they enjoy sovereign immunity.  Thus, in the absence of a

waiver or congressional abrogation of immunity, the court lacks

subject matter jurisdiction to determine plaintiff's claims

against the Tribe.

### C. Sovereign Immunity of the Poospatuck Smoke Shop

In finding that the Unkechauge Nation is a tribe and

entitled to sovereign immunity, the court next addresses whether

the Poospatuck Smoke Shop is an arm of the tribal government

and, therefore, entitled to immunity.  Official tribal

enterprises that act as a division or arm of the tribe are

immune from suit as an extension of the tribe's sovereign

immunity.  See, e.g., Native Am. Distrib. v. Seneca-Cayuga

Tobacco Co., 546 F.3d 1288, 1292-96 (10th Cir. 2008) (holding

that tobacco manufacturer had sovereign immunity as an

enterprise of the tribe, which deprived the district court of

subject matter jurisdiction); Allen v. Gold Country Casino, 464

F.3d 1044, 1046 (9th Cir. 2006) (holding that casino was

entitled to tribal sovereign immunity as an arm of the tribe);

accord Bassett v. Mashantucket Pequot Tribe, 204 F.3d 343, 358

(2d Cir. 2000) ("It may be that the district court will conclude, upon further analysis, that the museum is an agency of the Tribe and, as such, is entitled to benefit from the Tribe's immunity.").

In evaluating whether the Smoke Shop is entitled to sovereign immunity, "[t]he question is not whether the activity may be characterized as a business, which is irrelevant under Kiowa, but whether the entity acts as an arm of the tribe so that its activities are properly deemed to be those of the tribe." Allen, 464 F.3d at 1046; see, e.g., Hagen v. Sisseton-Wahpeton Cmty. College, 205 F.3d 1040, 1043 (8th Cir. 2000) ("[T]he College serves as an arm of the tribe and not as a mere business and is thus entitled to tribal sovereign immunity."); Ramey Constr. Co. v. Apache Tribe, 673 F.2d 315, 320 (10th Cir. 1982) (affirming the district court's determination that an inn was "a sub-entity of the Tribe rather than a separate corporate entity, and is thus clothed with the sovereign immunity of the Tribe").

In its December 22, 2006 Memorandum & Order (Dkt. No. 29), the court set forth the factors used by courts to determine whether an entity is an arm of a tribal government and ordered the evidentiary hearing in part to determine if the Poospatuck Smoke Shop satisfied any of the factors. The factors to consider are whether:

- The entity is organized under tribal constitution or laws (rather than federal law).
- The organization's purpose(s) are similar to a tribal government's (e.g., promoting tribal welfare, alleviating unemployment, providing money for tribal programs).
- The organization's managing body is necessarily composed primarily of tribal officials (e.g., organization's board is, by law, controlled by tribal council members).
- The tribe's governing body has the unrestricted power to dismiss members of the organization's governing body.
- The organization (and/or its governing body) "acts for the tribe" in managing the organization's activities.
- The tribe is the legal owner of property used by the organization, with title held in tribe's name.
- The organization's administrative and/or accounting activities are controlled or exercised by tribal officials.
- The organization's activities take place primarily on the reservation.

(Dkt. No. 29.) (citing William V. Vetter, Doing Business with Indians and the Three "S"es: Secretarial Approval,Sovereign Immunity, and Subject Matter Jurisdiction, 36 Ariz. L. Rev. 169, 176-77 (Spring 1994) (citing In re Greene, 980 F.2d 590 (9th Cir. 1992); Ramey Constr. Co. v. Apache Tribe of Mescalero Reservation, 673 F.2d 315 (10th Cir. 1982)); Hagen, 205 F.3d at 1043-44; Pink v. Modoc Indian Health Project, 157 F.3d 1185 (9th Cir. 1998), cert. denied, 528 U.S. 877 (1999); EEOC v. Fond du Lac Heavy Equip. & Constr. Co., 986 F.2d 246, 248, 251 (8th Cir. 1993)). As the court previously noted, common among these

factors is that the tribal entity operates "not as a mere business," Hagen, 205 F.3d at 1043, but rather as an extension of the tribe's own economic activity, "so that its activities are properly deemed to be those of the tribe" itself. Allen, 464 F.3d at 1046.

The Poospatuck Smoke Shop has not satisfied these criteria. The only evidence that the Smoke Shop submitted in support of its status as an entity of the Unkechauge is Chief Wallace's testimony that businesses on the Unkechauge tribal grounds must be licensed by the tribal council. (Wallace Tr. at 85, 157; 12/22/08 Oral Arg. Tr. at 41.) This testimony does not satisfy the above factors by a preponderance of the evidence for establishing that the Smoke Shop is an arm of the tribe. Therefore, the Poospatuck Smoke Shop's motion to dismiss is denied.

### D. Immunity of Chief Harry Wallace

The court next addresses the immunity of defendant Chief Harry Wallace. "[T]ribal sovereign immunity does not extend to individual members of a tribe." Catskill Dev., L.L.C. v. Park Place Entm't Corp., 206 F.R.D. 78, 86 (S.D.N.Y. 2002) (citing Puyallup Tribe, Inc. v. Dep't of Game of State of Washington, 433 U.S. 165 (1977)). If, however, a tribal government official is sued in his or her official capacity for

actions within the scope of his or her official tribal capacity, he or she shares in the tribe's immunity. <u>Chayoon v. Chaos</u>, 355 F.3d 141, 143 (2d Cir. 2004).

In this case, plaintiff has sued Chief Wallace in his capacities as an individual, a tribal government official, and a business owner. Chief Wallace enjoys tribal immunity from suit only to the extent that he is sued in his official tribal capacity for acts within the scope of his tribal authority. Chief Wallace is not immune from suit to the extent that he is sued in his individual capacity or, in light of the court's conclusion that the Poospatuck Smoke Shop is not entitled to immunity, to the extent that he is sued for acts in his capacity as the owner of the Smoke Shop.

**CONCLUSION**

Based on the foregoing, the defendants' motion to dismiss is granted in part and denied in part as follows: 1) the Unkechauge Nation's and, as sued in his official tribal capacity, Chief Harry Wallace's motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure is granted.  2) As sued in his individual capacity and in his capacity as owner of the Poospatuck Smoke Shop, Chief Wallace's and the Poospatuck Smoke Shop's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) is denied.


**SO ORDERED.**

Dated: October 8, 2009
       Brooklyn, New York


_____    /s/_____ _____
KIYO A. MATSUMOTO
United States District Judge
Eastern District of New York